FRED A. MEINERSHAGEN, Appellant, v. O. P. TAYLOR, O. P. TAYLOR, Trustee and C. R. WOODRUFF, Respondents.

Kansas City Court of Appeals, March 3, 1913.

1. **CONTRACTS: Vendor and Vendee: Remedies: Stockholders.** When the vendee receives a certificate of capital stock purchased by him, and discovers that the conditions of the sale have not been performed by the vendors, he has the choice of two remedies, viz.: first, that of a rescission of the contract and, second, that of accepting and standing on the contract and suing at law to recover the damages he had sustained in consequence of the breach of the vendors.

2. ———: **Pleading: Causes of Actions.** A plaintiff cannot plead one cause of action and recover on another, and to maintain an action for breach of contract it devolves on the plaintiff to prove that in seasonable time he exercised his choice of remedies, elected to rescind the contract and fulfilled the requirements of law necessary to a proper exercise of such right.

3. ———: ———: **Reasonable Time: Position.** When a party seeks to rescind a contract he must do so unequivocally and in a reasonable time and must be able to put the other party in substantially the same position he was in when the contract was made.

4. ———: ———: **Impairment: Condoning of Fraud.** Unreasonable delay, especially when accompanied with acts which recognize the contract as in existence, will be construed as condoning the fraud alleged to have impaired the contract.

5. ———: **Discovery of Fraud: Rescission.** Whenever a right arises by reason of the discovery of fraud then the right of election springs up also; election as to whether the party deceived will rescind or will treat the transaction as a contract.

6. ———: **Repudiation of Contract: Express and Unequivocal Terms.** When an election springs up the plaintiff must show that he promptly repudiated the contract in express and unequivocal terms, and accompanied such repudiation with an offer to restore the *status quo* and thereafter kept his offer or tender good.

Appeal from Jackson Circuit Court.—*Hon. E. E. Porterfield,* Judge.

AFFIRMED.

*Scarritt, Scarritt, Jones & Miller* for appellant.

*New & Krauthoff* and *P. E. Reeder* for respondents.

JOHNSON, J.—The petition alleges that on May 26, 1907, plaintiff purchased of defendants ten shares of the capital stock of the Taylor-Woodruff Dry Goods Company of the par value of $100 per share and paid $1000 to defendants for the same; that defendants failed and refused to deliver said stock but instead sent plaintiff, through the mails, a certificate for ten shares of the capital stock of the Swofford Brothers Dry Goods Company, of the par value of $100 per share; that plaintiff refused to accept the stock thus delivered and tendered it back to defendants and demanded a return of the purchase price, and that defendants refused to take back the stock or return the purchase price. A tender of the certificate into court is made and the prayer of the petition is for the recovery of the purchase price with interest.

The defendants answered separately. The answer of Woodruff is a general denial; that of Taylor pleads facts tending to show performance of the contract of sale, and that plaintiff received and retained

the stock with full knowledge of the real facts of the transaction. A trial of the issues resulted in a verdict for plaintiff but afterward the court sustained the motion for a new trial filed by defendants on the ground that "the court erred in refusing certain instructions to the jury." Plaintiff appealed from the judgment granting a new trial.

The material facts of the case are as follows: Prior to May 29, 1907, the Swofford Brothers Dry Goods Company, incorporated under the laws of this State, was engaged in the wholesale dry goods business in Kansas City. Its capital stock was $1,000,000, of which $400,000 was preferred and $600,000 common stock. Two brothers of the name of Swofford were the principal stockholders and managing officers of the company. In February, 1907, defendants Taylor and Woodruff, who were engaged in the wholesale dry goods business in Wichita, Kansas, entered into negotiations with the Swoffords to purchase the capital stock of the Swofford Company with a view of obtaining control of the business and of operating it under a new management. The negotiations resulted in the execution of a contract by the terms of which defendants agreed to purchase all of the capital stock of the company. Defendants intended to and did take a large block of the stock themselves but they did not have the means to finance the purchase and depended on sales of stock to carry out their plan for a reorganization of the company. This plan, which afterwards was consummated, contemplated the reduction of the capital stock from $1,000,000 to $600,000, of which $200,000 would be preferred and $400,000 common stock, the substitution of new stockholders and officers for the old and either the incorporation of a new company or a change of the name of the old to the Taylor-Woodruff Dry Goods Company. Defendants succeeded in selling the stock and procuring new stockholders with one exception, viz., they sold $100,000 of

the preferred stock to one of the Swoffords, reserving to themselves an option to repurchase that stock in a stated time. The new organization was completed in the latter part of May, 1907, a new corporation was not formed nor was the name of the old changed, but with the exception noted, there was a new set of stockholders and new officers were elected. Taylor was made president and Woodruff vice president and on May 29, the business was formally turned over to the new management. The capital stock was reduced as intended, and all of the old certificates of stock were called in and cancelled and new certificates were issued to the new subscribers.

Defendants state they postponed changing the name of the corporation for reasons of credit and afterward on account of adverse business conditions, were compelled to abandon the idea. Whatever the reason, the name was not changed and the business was operated by the old corporation but under new officers and with new stockholders with the single exception of Mr. J. J. Swofford who continued in the ownership of $100,000 of the preferred stock and was elected to the board of directors.

Plaintiff, a traveling salesman, living at Chillicothe, had a conversation with another traveling salesman—a Mr. Campbell—during the period when defendants were engaged in the work of reorganization and were selling stock. Campbell, who was a friend of plaintiff, had subscribed for $5000 of the common stock and had been promised employment by defendants as a traveling salesman. He had not been employed to sell stock, and it appears that he approached plaintiff for the purpose of soliciting him to purchase stock on his own motion and with the motive of promoting his own interest by aiding in the work of reorganization. He told plaintiff that he was going to travel for the new concern, had subscribed for stock and would be pleased if plaintiff would become a subscriber. Plain-

tiff, so he states, replied that he "would not have any-thing to do with anything that Swofford was con-nected with in any way." Campbell answered, "These new people are good people, are coming from Wichita, are good business men, and have no connection with Swofford at all."

The subject was renewed in a later conversation in which plaintiff said, "I will take stock in that con-cern providing Mr. Swofford has no connection with the company in any way. I know his reputation all over the neighborhood." About two weeks later Campbell saw plaintiff again and stated "they were ready to issue stock," whereupon plaintiff said, "all right," and inquired to whom his check should be made payable. Following the instructions of Campbell, he drew a check dated May 25, 1907, payable to the order of "O. P. Taylor, trustee of the Taylor-Woodruff Dry Goods Company," for $1000 and wrote on the face of it, "For ten shares of stock in the Taylor-Woodruff Dry Goods Company." He mailed this check to de-fendants and Mr. Taylor, who at that time was receiv-ing the funds, derived from stock sales, as trustee of the promoters, received and cashed the check. On May 29 which, as stated, was the day the new management took charge of the business, defendants caused a cer-tificate for ten shares of stock to be issued and deliv-ered by mail to plaintiff. The old certificate forms of the Swofford Bros. Dry Goods Company were used for the new issue, but erasures and interlineations were made to show the reduction in the capital stock. The certificate was signed by the new president and secretary. Plaintiff was traveling and did not receive the letter containing the certificate until two weeks after it had been mailed. Observing that it was for stock in the Swofford Bros. Dry Goods Company and not in the Taylor-Woodruff Dry Goods Company, as he understood from Campbell it would be, he tele-phoned defendants from Chillicothe and talked with

Mr. Woodruff. In substance he said he had bought stock in the Taylor-Woodruff Company and did not want Swofford stock. Woodruff replied, "Mr. Taylor is not in but I will see Mr. Campbell about it and will make it satisfactory to you."

Several days later Campbell called on plaintiff at Chillicothe and assured him "that the concern was going to be a new concern entirely;" that "Swofford Brothers would not have any connection with it and they wouldn't use the name in it," and that he had the same kind of stock himself. Plaintiff said, "I don't want any stock that Mr. Swofford has got anything to do with and I want my money back." Campbell answered, "don't urge this thing too much with Woodruff and Taylor because I want things easy for me," and asserted that the name of the corporation would be changed to Taylor-Woodruff Dry Goods Company about the first of the following year. In the course of the conversation plaintiff said, "How does it come that he uses the name? And he said he didn't know, and I said, 'I won't have anything to with it,' and he said, 'I will see Taylor and Woodruff Monday.'"

About two weeks afterward Campbell called on plaintiff again and stated that defendants had promised "to reimburse me for the stock" and requested plaintiff "not to do anything to hurt the firm and please not to push it." Plaintiff promised "not to push it if they agreed with him to take up the stock." Nothing further occurred for a month when plaintiff had another conversation with Campbell in which he urged plaintiff to come to Kansas City and adjust the matter with defendants, promising that defendants "will straighten those things out and take up the stock. The affair then passed into its epistolary stage which opened with the following letter addressed by plaintiff to Taylor, under date of August 23, 1907:

"On 5-25 I bought ten shares of stock from you

and as I am making improvements in my own store I can use the money to a better advantage and would like to place shares with you assuring you my good will will always be the same as Mr. Campbell is a friend of mine and I will do all I can for him. Kindly let me hear at once and oblige.''

No answer to this letter is in the record. Under date of Sept. 7, plaintiff wrote Mr. Woodruff:

''Mr. Al Campbell was up to see me in regard to shares I have and said you would buy them. I think just as much of the concern as I ever did but I can use the money for my own business is why I want to sell, in fact I took the stock to assist Mr. Campbell as he is a good friend of mine and I sell lots of the same trade he sells and as my friends I figured it would assist him if I told them I was interested also, and I assure you I will never mention that I sold my stock to any of the trade; no doubt the stock will be of good value later and all I ask is six per cent on my money, $15 on the $1000, and as I need the money is why I would like to sell at once. Hope this is your desire and assure you I will always be loyal to Mr. Campbell; in fact I have already told my partner in clothing business to buy everything he can of Campbell and he has bought some underwear for spring of him and you will get considerable more when he comes up in October as he has relation there and it will please him to buy while there. You may send check subject to my stock and I will send same with much success and thanks.''

Woodruff replied Sept. 18: ''I am in receipt of your letter of the 7th, but on account of Mr. Taylor being absent I have been so extremely busy that I have not had time to reply. I will take this matter up within the next week or ten days and give you a definite reply.''

Plaintiff answered: ''Your letter to hand 9-18 in regard to stock. I balanced up my bank book and found I was in need of money and the extent of this

stock will assist me considerable. If Mr. Campbell didn't tell, I will, I bought out one of partners Dider Clo. Co. unexpected and that caused the bal on the red side and I would appreciate it very much to dispose of this stock at as early date as possible and greatly oblige.''

Woodruff replied September 27: ''Mr. Campbell was in Monday and talked with me in regard to your stock and he said he would like to see you himself and arrange to take this stock. He will see you Saturday and will talk the matter over with you.''

This ended the letter writing for a time. In October plaintiff, at the solicitation of Campbell, went to Kansas City and had an interview with defendants at the offices of the company. Plaintiff's statement of what occurred is as follows: ''I saw Mr. Woodruff first; and then he introduced me to Mr. Taylor, over there. At first Mr. Taylor snubbed me, and didn't want to talk with me; and said he had nothing to do with the stock, and so forth and so on; and he and I had quite a few words, and I left, and then Mr. Swofford came in, and Mr. Woodruff introduced me to Mr. Swofford, and I said, 'Hello, Swofford is here, is he?' And he said, 'Yes,' and I said, 'Now, I have got to have a settlement —right now.' . . .

''Q. What did Mr. Woodruff or Mr. Taylor say there, in regard to Mr. Swofford's connection with the concern? A. Well, they didn't tell me anything in regard to it there. They just introduced me to Mr. Swofford. . . .

''Q. Well, what, if anything, did Mr. Woodruff say about Swofford being connected with that concern? A. Well, I asked them about it; and they avoided the question; and didn't say anything to me about it.

''Q. Now, what else took place there at that time? Go on, and tell what you did. A. Mr. Woodruff wanted to show me the books; and he said, 'Would you like to look at them?' and I said, 'No, sir;' and he says, 'Well,

now, we aren't able to take up this stock now; but we will take it up for you.  Mr. Taylor and I have talked over this matter, and we will take it up.  We don't want you to take anything you don't want to buy.' "

On November 11, plaintiff wrote another letter to Woodruff and Taylor as follows: "I have written you three or four times about the stock you sent me and you failed to respond.  I bought Woodruff & Taylor Dry Gds. Co. stock, and my letter and check that you got the money on called for same.  I regret but I must have the money; I will draw on you Friday if you don't send it, as you have promised long enough.  Send check of 1st Nat. Bank for ten shares and I will turn them over to them and greatly oblige."

Defendants did not take up the stock or return the purchase price to plaintiff and this suit followed.

We have stated the controlling facts in their aspect most favorable to plaintiff and in the view we take of the case it will not be necessary to review the evidence of defendants.

Though Campbell was not employed to sell stock and began the transaction in question on his own initiative, the evidence shows indisputably that defendants ratified what he had done, received and retained the fruits of his efforts and thereby made him their agent and become answerable for his representations and warranties.  We do not agree with the idea pressed so vigorously by counsel for plaintiff that he bought stock in one corporation and stock in an entirely different corporation was delivered to him by defendants. He knew at the time he sent his check that defendants were forming an organization to take over the business then being conducted by the Swofford Bros. Dry Goods Company.  There was no agreement that a new corporation would be created.  The prime condition on which plaintiff bought the stock was that the Swoffords should have no interest in the business, neither should their name be used in the concern.  Those conditions would

have been satisfied had defendants excluded both of the Swoffords from the new organization and changed the name of the corporation to the Taylor-Woodruff Dry Goods Company. When plaintiff received the certificate sent him by defendants he did not know that one of the Swoffords still was connected with the business but he did know, for the certificate so informed him, that the old name had been retained and, therefore, that the conditions on which he had made the purchase had been breached. Defendants delivered to him the stock he intended to buy but violated conditions of the sale which he had made conditions precedent and which defendants must be held to have accepted as such.

We do not acquiesce in the argument of defendants that the contract was not broken by them and that plaintiff had no ground on which to rescind the sale. The case relied on to support this contention (Smith v. Bank, 95 S. W. Rep. 1111) is not in point. There the subscriber to the capital stock of a corporation was told at the time of his subscription that certain persons were stockholders but he did not purchase the stock on condition that the statement was true. Here the representations and agreements in question were expressly made conditions precedent and so understood by both parties. The condition was material and important. Plaintiff did not wish to be associated in any business enterprise with the Swofford brothers. Whether his reason was mere personal dislike or a lack of confidence in their business methods or reputation is immaterial. He had a right to choose his business associates and to enter into a contract that would give effect to such right. When he received the certificate and discovered that the conditions of the sale had not been performed by defendants, he had the choice of two remedies, viz., *first,* that of a rescission of the contract and, *second,* that of accepting and standing on the con-

tract and suing at law to recover the damages he had sustained in consequence of the breach of defendants.

The cause of action pleaded in the petition is at law for the results or consequences of a rescission and necessarily is based on the ground that before bringing the suit, plaintiff had already exercised his right to rescind. Counsel for plaintiff argue to the contrary but we hold that the allegations "that upon the receipt of said certificate plaintiff refused to accept the same and tendered back the certificate for said stock to defendants and demanded a return of the said one thousand dollars; that defendants refused to take back the certificate . . . or to return to plaintiff one thousand dollars although often requested so to do," and that "plaintiff tenders into court with this petition the certificate," etc., are inconsistent with an action for damages founded on an acceptance of the stock and are consistent only with one for the enforcement of plaintiff's duly exercised right of rescission.

The rule is fundamental that a plaintiff cannot plead one cause of action and recover on another and to maintain this action it devolved on plaintiff to prove that in seasonable time he exercised his choice of remedies, elected to rescind the contract and fulfilled the requirements of law necessary to a proper exercise of such right. There is no uncertainty in the rules applicable to the rescission of contracts.

"When a party seeks to rescind a contract he must do so unequivocally and in a reasonable time and must be able to put the other party in substantially the same position he was in when the contract was made." [Shultz v. Christman, 6 Mo. App. 338.]

"Unreasonable delay, especially as accompanied with acts which recognize the contract as in existence, will be construed as condoning the fraud alleged to have impaired the contract." [Harms v. Wolf, 114 Mo. App. 387.]

"Whenever that right arises by reason of the discovery of fraud then the right of election springs up also; election as to whether the party deceived will rescind or will treat the transaction as a contract." [Taylor v. Short, 107 Mo. 1. c. 392.]

The foundation of the right of rescission is a tender of the property back to the seller promptly on discovering the defect which is relied on for rescission. An offer to rescind and tender by the buyer is a repudiation of right and title to the property. He must not thereafter use the property as his own or it will amount to a waiver of the right to rescind. [Sturgis v. Whistler, 145 Mo. App. 148.]

Plaintiff must show that he promptly repudiated the contract in express and unequivocal terms and accompanied such repudiation with an offer to restore the *status quo* and thereafter kept his offer or tender good. That is what he alleges he did do but his own testimony disproves that allegation. From the first he expressed dissatisfaction with defendants' performance of the contract and repeatedly threatened a rescission but at no time prior to his letter of November 17, written almost six months after the delivery, did he evince a clear and unequivocal purpose to rescind. In his letter of September 7 to Mr. Woodruff, written three and a half months after the delivery, he speaks of himself as owning the stock, says he would like to sell it and asks Woodruff to buy it and in the next two letters he urges Woodruff, one of the defendants against whom he is now claiming the right of rescission, not to pay him back his money, but to buy or at least dispose of his stock for him. The reason he gave is not that Woodruff defrauded him or violated the contract of sale, but that he needed money for other purposes and was compelled to sell the stock to raise it. The explanation he offers for writing such letters is that Campbell kept promising him that defendants would take the stock back and return his money as soon as

they were able to do so and that he was relying on that promise and followed Campbell's request that he should do nothing to excite defendants to anger, but that is no excuse in law for his failure to exercise his right of rescission promptly.

Suppose this stock the day after plaintiff wrote the letter of September 7 had doubled in value, could defendants have successfully denied plaintiff's title to the stock? They could if there had been a legal rescission of the sale by plaintiff but we apprehend defendants would have had a hard time maintaining such a claim in court in view of the facts that plaintiff had not unequivocally repudiated the contract and offered to return the certificate, but had contented himself with the promise of defendants' agent that they would take the stock back and refund his money as soon as they were able. As is said in the case of Grymes v. Sanders, 93 U. S. l. c. 62, a vendee who has the right of rescission is not permitted to play fast and loose, to blow hot and cold, to put himself in the position where he can repudiate or stand on the contract at will. Plaintiff should have repudiated the contract in a reasonable time after he received the certificate and failing so to do, waived his right to rescind.

The learned trial judge should have peremptorily directed a verdict for defendants and no error was committed in granting a new trial.

The judgment is affirmed. All concur.