358 F.Supp. 8 (1973)
FOAM-TEX INDUSTRIES, INC., a corporation, Plaintiff,
v.
The RELAXAWAY CORPORATION, a corporation, Defendant.
No. 71 C 541 (A).
United States District Court, E. D. Missouri, E. D.
March 30, 1973.
*9 Bernard Susman, St. Louis, Mo., for plaintiff.
Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
HARPER, Senior District Judge.
Plaintiff, Foam-Tex Industries, Inc., a Missouri corporation, sued defendant, Relaxaway Company, a California corporation having its principal place of business in California, in the Circuit Court of the City of St. Louis for $22,378.87, alleged to be due for the sewing of cot covers for defendant's Slim Gym exercising device. Defendant removed the case to this Court, pursuant to 28 U.S.C. § 1441, and filed a counterclaim for $75,000.00, in damages, alleged to be the result of plaintiff's breach of express and implied warranties. This Court has jurisdiction under 28 U.S.C. § 1332.
This case was tried before the Court without a jury. After plaintiff presented two witnesses and introduced several documents into evidence, the attorneys of the parties stipulated that the balance showed owing in Exhibit 1 (the amount claimed by plaintiff to be due) was represented by deliveries of clothbound cot covers and not plastic-bound cot covers. Defendant had admitted in its answer that this amount was due to plaintiff and its counterclaim was only directed at the plastic-bound cot covers sewed by plaintiff. The Court, therefore, directed a verdict for plaintiff on its claim and proceeded to hear the counterclaim. This memorandum opinion will deal only with defendant's counterclaim.
Defendant, by its counterclaim, alleges that before defendant entered into a contractual relationship with plaintiff, wherein plaintiff was to cut material supplied by defendant in accordance with a pattern supplied by defendant, sew binding around these cloths to make covers, and sell defendant the material used for the binding, that defendant provided plaintiff with a sample cover to which plaintiff's cover was to conform and be equal or superior to in all respects. Defendant alleges that the binding of the sample cover was cloth and that plaintiff proposed substituting a plastic binding. Defendant alleges that plaintiff made an affirmation to defendant that the plastic binding was as strong as and would last longer than the cloth binding and that this affirmation, together with the sample cover furnished by defendant, became part of the contract between plaintiff and defendant. Defendant alleges that the plastic binding broke, split, cracked, and generally failed as a binding during use, and that over 7,000 Slim Gym devices were returned to defendant with defective plastic binding. Defendant alleges that the failure of the plastic binding constituted a breach of the express warranties made by plaintiff, a breach of plaintiff's implied warranty of merchantability, and of plaintiff's implied warranty of fitness for the purpose for which the covers were used. Defendant prays for damages in the amount of $75,000.00.
Plaintiff, by its answer to defendant's counterclaim, admits that defendant provided plaintiff with a sample cover, but denies that its cover was to conform and be equal or superior to defendant's cover *10 in all respects, or that it made any express warranties of any kind, or breached any implied warranties.
Defendant has produced an exercising device called a Slim Gym since mid-1967. The Slim Gym has two basic components, a steel frame and a cot cover. Defendant would contract for the preparation of the component parts and then assemble the parts itself. Initially, defendant used canvas material for the cot covers, but in the early part of 1968 switched to a green plastic material because it could not procure all of the canvas material it needed. Defendant planned to open a St. Louis assembly plant in December, 1969. Defendant needed a firm to sew covers for its St. Louis assembly plant and contacted plaintiff. Plaintiff is a sales corporation for the products that Foam-Tex Corporation produces. Foam-Tex Corporation sews goods for customers according to the customer's specifications.
The testimony at the trial as to conversation and events that occurred after defendant first contacted plaintiff was often in direct conflict. The credible evidence discloses that on approximately November 6, 1969, T. Goodwin Lyon, president of defendant, contacted Mrs. Josephine Goddard, plant manager of plaintiff, and obtained an appointment to meet with Mrs. Goddard later that day. Goodwin Lyon and his brother, Robert, a divisional manager and vice president of defendant, met with Mrs. Goddard and toured plaintiff's plant. Goodwin and Robert Lyon took a finished Slim Gym, three covers, a frame, and the specification for the covers with them and demonstrated the unit for Mrs. Goddard and several workers at plaintiff's plant. A pattern was made from the specification provided by Goodwin Lyon and two sample cot covers were prepared by the employees of plaintiff. These cot covers differed from the specification provided by defendant in two respects. Plaintiff used a binding of unsupported plastic, whereas the specification indicated that the binding was to be of braiding (a binding woven on the bias and usually made of cotton), and plaintiff attached the binding with a straight stitch, whereas the specifications showed that the binding should be attached by a zig-zag stitch. Plaintiff had no zig-zag sewing machines or non-plastic binding in its plant at the time Goodwin and Robert Lyon visited the plant. The sample covers were completed approximately two days after plaintiff received the specifications. Mrs. Goddard, accompanied by her husband, met with Goodwin Lyon and Les Hamilton, defendant's St. Louis plant manager, at the Quality Motel in St. Louis, and presented Goodwin Lyon with one of the cot covers plaintiff had sewed. There was a discussion about the plastic binding and Lyon and Hamilton commented that they liked it because it was white and could be wiped off. Mrs. Goddard made no representations that the unsupported plastic binding was as strong as cotton binding or would last longer than cotton binding or was equal or superior to any other type of binding. Mrs. Goddard told Lyon that plaintiff did not have a zig-zag sewing machine and he agreed to let plaintiff use a single needle stitch. Goodwin Lyon testified that he did not rely on the skill or judgment of Mrs. Goddard in choosing a binding. Defendant has a machine in Los Angeles that tests the Slim Gym. Sand bags are placed on the Slim Gym and the machine makes the Slim Gym work. Goodwin Lyon testified that he could never recall testing the cover sewed by plaintiff.
On November 13, 1969, defendant ordered 15,000 cot covers to be sewed by plaintiff at ninety-three cents per cover (Exhibit I). This was the only written order made by defendant for the sewing of cot covers. All subsequent orders were verbal. Plaintiff sewed over 50,000 cot covers for defendant. Plaintiff first delivered cot covers to defendant on December 8, 1969 (Exhibit A). These cot covers had plastic binding which was sewed with a straight stitch.
Due to plaintiff changing the type of nylon thread it was using and the method by which it stitched the seams, the *11 cost for the sewing of cot covers increased to ninety-nine cents per cover on January 23, 1970 (Exhibit 4, Invoice 3202). Both of these changes were made at the request of defendant even though the original thread and method plaintiff used were in accordance with the specification submitted by defendant. Some time after these changes were made (the date is not clear from the record), Robert Lyon asked Mrs. Goddard if she had any binding that would be stronger than that plaintiff had been using. This request was made because the unsupported plastic binding was subject to cracking and breaking. Mrs. Goddard showed Robert Lyon some supported plastic material (plastic having a cloth backing), and shortly thereafter Mrs. Goddard was instructed to change to a supported plastic binding. The supported plastic binding was also subject to cracking and breaking and, at the request of defendant, plaintiff began using a woven cotton binding on approximately April 29, 1970 (Exhibit 6). Plaintiff continued sewing cot covers for defendant until defendant ceased supplying the green plastic cot cover material to plaintiff. The last shipment of cot covers from plaintiff to defendant occurred on June 24, 1970 (Exhibit 4, Invoice 827).
During the time while plaintiff was sewing cot covers for defendant, defendant only returned cot covers during one period, from December 30, 1969, to January 20, 1970 (Exhibit 4, Invoice 3206 and attached documents). The cot covers were returned because of defects in the sewing. Mrs. Goddard received requests almost daily from either Goodwin Lyon, Robert Lyon, Carl Stewart, plant manager of defendant's St. Louis plant, or Miss Bert Leonard, office manager of defendant's plant, asking plaintiff to increase its production of cot covers. Defendant never refused to take any covers with plastic binding. Robert Lyon testified that he picked up covers having plastic binding from plaintiff after he learned that the plastic binding was breaking and cracking. No cot covers were ever returned to plaintiff on account of the binding cracking or breaking. Payments for the cot covers sewed by plaintiff continued until May 22, 1970, approximately one month after plaintiff began using cloth binding on the cot covers it sewed.
Defendant's dealers returned many Slim Gym units to defendant for repairs and repaired some themselves. The units returned had various defects such as chrome plating that had peeled, broken leg frames, stitching that had come undone, damage to the cover caused by rivets, delamination of the green plastic cover, damaged straps, green plastic cover material that had pulled away from the binding, and plastic binding that had cracked and broken. The exhibits introduced to show the defects in the units returned to defendant (Exhibit 9) and the repairs made to the Slim Gym (Exhibits J, L and M) fail to indicate which of the defects occurred in cot covers sewed by plaintiff and which occurred in cot covers sewed by other companies which sewed cot covers for defendant. The reports contained in Exhibit 9 cite the failure of the plastic binding as a defect in very few instances. Exhibits J, L and M show that the covers were replaced on most of the Slim Gyms that were repaired, but do not state why the covers were replaced.
John Flumerfelt, who had worked at defendant's St. Louis plant and replaced cot covers on defective Slim Gym units, testified that ninety percent of the covers listed as being replaced in Exhibit J had defective plastic binding. George Werner, a regional distributor for plaintiff, testified that ninety percent of the units he received with a plastic binding were returned because the plastic binding was defective. Jane Connolly, an office manager for a distributor of defendant, testified that approximately ninety percent of the plastic-bound units that were sold from the office where she worked were returned because of cracking and splitting of the binding. The testimony of these three witnesses is inconsistent with the testimony of two other witnesses. *12 Miss Bert Leonard, officer manager of defendant's St. Louis plant until May 1, 1970, testified that most of the defects in the covers that were returned to defendant's St. Louis plant while she was employed by defendant were caused by the green plastic material of the cot covers pulling away from the binding. She testified that this defect occurred no more often with plastic-bound covers than with clothbound covers. Carl Stewart, the plant manager of defendant's St. Louis plant, testified that the plastic binding had more of a tendency to crack than the woven tape binding, but with respect to other damage to the cot covers there was no observable difference between covers with different types of binding. He testified that he worked for defendant for approximately ten months after defendant ceased buying covers from plaintiff, and that during this period the rate of the units coming in for repair either did not change or increased.
Defendant produced an expert witness who testified that the woven cloth binding used on the cot covers was three times stronger than the supported plastic binding based on a stress measurement and was able to withstand twice the strain. The expert witness also measured the stress and strain the green plastic sheet material used in making the cot covers could withstand and found it able to withstand a greater stress and strain than either of the bindings tested. The expert witness hypothesized from the data he obtained that eighty percent to ninety percent of the units with supported plastic binding would undergo failure of the binding, while less than five percent of the cloth binding on the clothbound units would fail. The expert witness did not test to see how easily the nylon thread would pull through the green plastic cover material, nor did he test the strength of the green plastic material after it had been punctured with holes by the thread.
The green plastic cover material consisted of three layers. Reinforcing cords were sandwiched between two sheets of plastic. On several of the cot covers introduced into evidence, the outer plastic sheets had split where the plastic had been sewed. It was evident that the holes made in the plastic where the stitching had punctured it weakened the outer plastic layers of the cot cover, causing the layers to split when they were subject to a load. Furthermore, the stitching of the binding would pull through the plastic and the few strands of reinforcing cords bordering the edge of the cot cover. As a result, the binding would separate from the cot cover even though the binding and thread would remain intact.
The expert witness testified that the binding was primarily put on the cot cover for looks.
Taking into consideration the nature of the green plastic cot material and the function of the binding, the Court finds the testimony of Stewart and Leonard to be the credible testimony as to the type of defects in the cot covers returned to defendant. Most of the defects in the cot covers were a result of the green plastic material furnished by defendant and the rate of return of defective Slim Gyms was not affected by the type of binding used.
As defendant states in its brief, all but a few events connected with this transaction took place in Missouri. The briefs of both parties treat the transaction as one governed by the laws of Missouri. The laws of Missouri are, therefore, applied by the Court to the transaction.
Because of the type of transaction involved, wherein plaintiff agreed to perform services for defendant and to provide certain materials in the performance of those services, a question arises as to whether the transaction is governed by the Uniform Commercial Code and whether implied warranties arose with respect to the transaction. Epstein v. Giannattasio, 25 Conn.Sup. 109, 197 A.2d 342 (1963); Newmark v. Gimbel's, Inc., 54 N.J. 585, 258 A.2d 697 (1969). The Missouri courts have not addressed *13 these questions in connection with a contract that has both the attributes of a service contract and of a sales contract, and this Court need not determine these questions in the instant case. Assuming the existence of warranties arising under the Uniform Commercial Code or under the common law of Missouri, defendant cannot recover on its counterclaim.
Under Missouri common law, a party injured by a breach of warranty has an election to rescind the contract within a reasonable time and recover the purchase price or to affirm the contract and sue for damages. Albert v. Kopplin Molding Corp., 247 F.2d 107 (8th Cir. 1957).
In regard to rescission, Adams v. Hughes, 235 S.W. 168, 170 (Mo.App. 1921) states:
"It is fundamental that a party seeking to rescind a contract must do so unequivocally and in a reasonable time, and must be able to put the other party in statu quo. Shultz v. Christman, 6 Mo.App. 338; Meinershagen v. Taylor, 169 Mo.App. 12, 154 S.W. 886. The basis of the right of rescission is a tender of the property back to the seller promptly on discovery of the defect which is relied on for the rescission."
In Stephens Industries, Inc. v. American Express Company, 471 S.W.2d 501, 504 (Mo.App.1971), the court states:
"Upon delivery of goods, the buyer has a reasonable time within which to determine whether or not the goods conform to the requirements of the contract and whether or not they are fit for the uses intended. If such goods do not conform to the contract or are not fit for the uses intended, the buyer, if he elects to rescind for such reason, must make known his rescission to the seller within a reasonable time after he discovers the defect or after the defect is discoverable * * *.
"Absent a specific provision in the contract, the buyer has a reasonable time within which to determine whether or not the goods are defective and such reasonable time depends upon all of the circumstances surrounding the transaction. See, Moore v. Smith, Mo.App., 255 S.W. 1071. The actions of the parties may affect what constitutes a reasonable time. Thus, where the buyer complains about defects in the goods and the seller persuades him to keep the goods while the seller attempts to remedy the defects, the reasonable time within which to rescind the contract is extended by such persuasion of the seller. (Citations omitted.)"
The facts of the present case do not justify the conclusion that a rescission of the contract between plaintiff and defendant ever occurred. As stated in Adams v. Hughes, supra, a tender of the property back to the seller is necessary for recission. Defendant made no such tender. Defendant argues in its brief that tender should not be required because it would require much time and effort by defendant and be useless to plaintiff. Assuming that a tender of the property would not be required in this case under Missouri law, there would still be no recission of the contract. A buyer must make known his intention to rescind a contract and must do so within a reasonable time. Defendant has not done this. Although defendant was dissatisfied with the strength of the plastic binding used by plaintiff and had plaintiff switch first to a supported plastic and later to a cloth binding, there was never any indication at these times that defendant wished to rescind the contract. Defendant did not even indicate in its counterclaim that a rescission of the contract had occurred. Defendant instead sought damages for breach of warranty. The first time defendant indicated that it had rescinded the contract was in its post-trial brief filed September 26, 1972, where it argued that there had been a revocation of acceptance by defendant. Defendant relies on Performance Motors, Inc. v. Allen, 280 N.C. 385, 186 S.E.2d 161 *14 (1972), and contends that defendant's complaints, which were followed by plaintiff changing the type of binding used, and defendant's cessation of payments, constituted a revocation of acceptance. In the case relied on, the defendant had purchased a mobile home, complained about numerous defects in the home when it was delivered, moved in but continued to complain of the defects, made three monthly payments and then no more since none of the defects were corrected by plaintiff, and continued to live in the mobile home until it was repossessed. The Court stated at page 168 of 186 S.E.2d:
"This evidence, considered in the light most favorable to defendant, would permit a jury to find that she initially accepted the mobile home on the reasonable assumption that plaintiff would correct the nonconforming defects and subsequently revoked her acceptance by reason of plaintiff's failure to do so. Constant complaints from September to December with cessation of payment would seem to constitute sufficient notice of revocation of acceptance. `Any conduct clearly manifesting a desire of the buyer to get his money back is a sufficient notice to revoke.' 2 R. Anderson, Uniform Commercial Code, § 2-608:16 at 245 (2d Ed.1971). Furthermore, `[a] tender of the goods by the buyer to the seller is not an essential element of a revocation of acceptance. All that is required by the Code is a notification of revocation.' Ibid., § 2-608:18 at 246."
The facts in the instant case are distinguishable in that the conduct of defendant did not manifest a desire to get its money back. Neither the complaints of defendant nor its cessation of payments approximately one month after plaintiff ceased using plastic binding manifested such a desire. The fact that defendant always accepted plastic-bound cot covers even after it knew of the problems with the binding compels the conclusion that there was no manifestation of a desire to revoke the contract while plaintiff was sewing plastic-bound cot covers. The only time plaintiff manifested such a desire was in its post-trial brief. This notice was not within a reasonable time.
Assuming there was a breach of warranty, the Court next considers the question of whether the defendant is entitled to recover damages. The proper measure of damages in Missouri for breach of warranty is the difference between the actual value of the property at the time of delivery and the value the property would have had if it conformed to the warranty. Albert v. Kopplin Molding Corp., supra; Fabick Brothers Equipment Co. v. Leroux, 375 S.W.2d 887 (Mo.App.1964).
The credible evidence in the instant case fails to disclose any difference in value between the cot covers which had a plastic binding and those which had a cloth binding. The rates of failure of the two types of cot covers were equal. Therefore, under Missouri common law, defendant is entitled to no damages on its counterclaim.
The identical result is obtained by applying the Uniform Commercial Code. Section 400.2-608(2) V.A.M.S., states:
"Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it."
As set forth previously, the conduct of defendant prior to trial did not constitute notice of revocation of acceptance and the notice given plaintiff in defendant's post-trial brief was not within a reasonable time. Defendant is, therefore, precluded from recovery of the purchase price under § 400.2-711(1) V. A.M.S.
The measure of damages to which defendant is entitled under the Code is set out in § 400.2-714(2) and is equivalent to the measure of damages applicable *15 under Missouri common law. Therefore, defendant would also not be entitled to any damages on its counterclaim if the Uniform Commercial Code governed the transaction between plaintiff and defendant.
This memorandum opinion is adopted by the Court as its findings of fact and conclusions of law. The clerk is directed to enter judgment on plaintiff's cause of action in the amount of $22,378.87 in accordance with the Court's order for a directed verdict, with interest from July 17, 1972, the date on which the Court directed the entry of a judgment during the trial. The clerk is further directed to enter judgment in favor of plaintiff on defendant's counterclaim.