PERFORMANCE MOTORS, INC. v. ALVA JANE RIGGS ALLEN

No. 84

(Filed 28 January 1972)

1. **Uniform Commercial Code § 13— parol evidence of additional consistent terms of sale**

Security agreement in which the buyer of a mobile home acknowledged delivery of the mobile home "in good condition and repair" was not intended as a "complete and exclusive statement of the terms of the agreement" within the meaning of G.S. 25-2-202(b), where the evidence of both parties showed that the mobile home was to be delivered and set up on defendant's lot and where the security agreement was signed by the buyer before the mobile home was delivered and installed, and the buyer's testimony with respect to the defective condition of the mobile home after it was installed was competent as evidence of additional consistent terms of the sale.

2. **Sales § 10; Uniform Commercial Code § 22— seller's action to recover purchase price — prima facie case**

In this action to recover the balance allegedly due on a secured promissory note executed by defendant incident to the purchase of a mobile home, plaintiff's allegation of the sale and delivery of the mobile home at the agreed price, and defendant's admission that she purchased the mobile home, executed the note and security payment, and refused to pay a portion of the purchase price agreed upon, makes out a *prima facie* case entitling plaintiff to go to the jury and, nothing else appearing, to recover the balance due on the note.

Motors, Inc. v. Allen

3. **Sales § 5; Uniform Commercial Code § 15— express warranty— "puffing of wares"**

Seller's statement that a mobile home "was supposed to last a lifetime and be in perfect condition" is merely an expression of opinion in "the puffing of his wares" and does not create an express warranty. G.S. 25-2-313(2).

4. **Sales § 6; Uniform Commercial Code § 15— implied warranty of fitness**

The sale of a mobile home carried with it an implied warranty that the mobile home was fit for the purpose for which it is ordinarily used, i.e., residential purposes, where the seller is a merchant with respect to the sale of mobile homes, and the security agreement executed by the buyer incident to the sale contains no language, as permitted by G.S. 25-2-316, excluding or modifying the implied warranty of merchantability.

5. **Sales § 6; Uniform Commercial Code §§ 15, 19— implied warranty— inspection by buyer**

While there is no implied warranty when the buyer, before entering the contract, examines the goods as fully as he desires and has knowledge equal to that of the seller, the buyer's inspection of a mobile home at the seller's place of business did not destroy the implied warranty of fitness imposed by law upon the sale where the contract of sale imposed on the seller the obligation to deliver the mobile home and "block it up" on the buyer's lot, since until that was completed the fitness of the mobile home for use as a home could not be ascertained by the buyer's examination and inspection. G.S. 25-2-316(3)(b).

6. **Uniform Commercial Code § 19— inspection after delivery**

Unless otherwise agreed, when the seller is required to send the goods to the buyer, the inspection may be after their arrival, and the buyer is entitled to a reasonable time after the goods arrive at their final destination to inspect and reject them if they do not comply with the contract. G.S. 25-2-513(1).

7. **Uniform Commercial Code § 19— making of down payment — right to inspect**

The buyer's down payment on a mobile home would not impair his right to inspect following delivery. G.S. 25-2-512(2).

8. **Uniform Commercial Code § 20— acceptance of goods**

Under the Uniform Commercial Code, acceptance of goods is ordinarily signified by language or conduct of the buyer that he will take the goods, but this does not necessarily indicate that the goods conform to the contract, G.S. 25-2-606(1)(a); acceptance may also occur by failure of the buyer to make an effective rejection after a reasonable opportunity to inspect. G.S. 25-2-606(1)(b).

9. **Uniform Commercial Code § 20— acceptance of goods — knowledge of nonconformity — revocation of acceptance**

Acceptance precludes rejection of the goods accepted and, if made with knowledge of a nonconformity, cannot be revoked because of it

Motors, Inc. v. Allen

unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured. G.S. 25-2-607(2).

**10. Uniform Commercial Code § 20— revocation of acceptance**

The buyer may revoke his acceptance if (1) the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured, and (2) the nonconformity substantially impairs the value of the goods. G.S. 25-2-607(2); G.S. 25-2-608(1).

**11. Uniform Commercial Code § 20— revocation of acceptance**

Revocation of acceptance must be made within a reasonable time after the buyer discovers, or should have discovered, the ground for it, and is not effective until the buyer notifies the seller of it. G.S. 25-2-608(2).

**12. Uniform Commercial Code § 21— revocation of acceptance — breach of implied warranty — election of remedies**

A buyer who properly revokes his acceptance is not required to elect between revocation of acceptance and recovery of damages for breach of implied warranty of fitness, both remedies being available to him. G.S. 25-2-608.

**13. Uniform Commercial Code § 21— rejection of goods — revocation of acceptance — implied warranty of fitness — measure of damages**

If the buyer of a defective mobile home (1) made an effective rejection of the mobile home or (2) justifiably revoked her acceptance of it, she may recover so much of the price as has been paid plus any incidental and consequential damages she is able to prove, G.S. 25-2-711(1); if the buyer accepted the mobile home and did not revoke such acceptance, she is obligated to pay the balance due on the contract price and is limited on her counterclaim to recovery of damages for breach of implied warranty of fitness.

**14. Uniform Commercial Code § 21— breach of implied warranty of fitness — measure of damages**

The measure of damages for breach of implied warranty of fitness is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless circumstances show damages of a different amount, plus incidental damages and such consequential damages as were within the contemplation of the parties. G.S. 25-2-714(2); G.S. 25-2-715.

**15. Uniform Commercial Code § 20— rejection of goods — insufficiency of evidence**

Defendant's evidence was insufficient to support a finding that she rejected a mobile home where it showed that, after telling plaintiff's agent when the mobile home was installed that "this is not right and I do not want it," defendant moved into the mobile home and made three monthly payments under the terms of the contract.

**16. Uniform Commercial Code § 20— revocation of acceptance — sufficiency of evidence**

Defendant's evidence was sufficient to permit a jury finding that she initially accepted a mobile home on the reasonable assumption that plaintiff would correct the nonconforming defects, and that because of plaintiff's failure to do so, defendant revoked her acceptance by continually complaining to plaintiff of the defects from September to December and thereafter ceasing to make payments under the contract.

ON *certiorari* to the Court of Appeals to review its decision (11 N.C. App. 381, 181 S.E. 2d 134) vacating judgment of *Parker, J.,* October 1970 Session of JONES Superior Court, and awarding plaintiff a new trial.

Plaintiff instituted this action on 5 May 1969 to recover the balance allegedly due on a promissory note executed by defendant incident to the purchase of a mobile home and secured by a security interest (conditional sales agreement) in the mobile home.

Plaintiff alleges defendant executed a promissory note for $10,097.64 payable to plaintiff in eighty-four monthly installments of $120.21 and signed an agreement granting plaintiff a security interest in the mobile home in the amount of the note; that after making two monthly payments defendant defaulted and, notwithstanding demand, has failed, neglected and refused to make further payments; that plaintiff rightfully repossessed the mobile home by claim and delivery proceedings and resold it at public auction for $9,115 which was duly credited on the note after deduction of necessary expenses incident to the repossession and sale; and that plaintiff is entitled to recover the deficiency which the parties stipulated could not exceed $855.

Defendant answered admitting execution of the note and conditional sales agreement but denying all other material allegations of the complaint. Further answering by way of counterclaim, defendant alleges that, prior to the execution of the note and conditional sales agreement, plaintiff, through its agents, expressly warranted and represented that said mobile home was of sound construction, free from all defects of workmanship and material, and would remain in first-class condition for a period of many years after its purchase, and further represented that plaintiff "would properly install and set up

said mobile home on the lot designated by the defendant and would properly wire the same and connect the same to proper commercial outlets and would connect the septic tank by pipe leading from said mobile home"; that all such warranties and representations by plaintiff were false when made, known by plaintiff to be false, made with intent to deceive defendant and to induce her to purchase the mobile home, and in fact did deceive defendant; that in reliance upon them she purchased the mobile home and executed the note and conditional sales agreement.

Defendant further alleged in her counterclaim that plaintiff delivered said mobile home to defendant on a designated lot in Maysville, North Carolina; that plaintiff did not properly wire and connect said mobile home to commercial outlets, did not furnish the pipe and connect the same to the septic tank as a result of which plaintiff spent $75 to have the house wired and connected and $78.60 in connecting said home to the septic tank. She further alleged that the said mobile home was not well made, not free from defects in workmanship and material, and was installed incorrectly on its foundation so that it was never level; that the ceilings sagged throughout the home, the carpeting had been cut, the front door was installed out of line and refused to close properly, sofa springs were broken, plastic counter tops were chipped, cabinet doors and shelves did not function correctly, walls throughout the home became warped, bowed and loose, toilet tanks and seats were broken, door facings throughout the trailer became loose, vinyl floors were cut, scarred and installed without a proper subfloor, all heating vents protruded from their proper location, and the heating unit did not operate properly.

Defendant further alleged that, relying on plaintiff's express and implied warranties, she made a down payment of $4,000 on the mobile home and three monthly payments of $120.21 each which, when added to her expenditures for wiring and septic tank connection, total $4,514.23; that by reason of the enumerated defects the mobile home was completely unfit and unserviceable for use as a home; that defendant repeatedly notified plaintiff of the defects and was reassured that said defects would be repaired but such repairs were never made; that defendant elected before the commencement of this action, and now elects, to rescind said contract on account of plaintiff's

breach of warranties, both express and implied; that defendant is entitled to recover of plaintiff $4,360.63 paid on the purchase price plus $153.60 for the wiring and septic tank connection, a total of $4,514.23, with interest from 21 December 1968.

The parties stipulated that if defendant owed plaintiff anything she would not owe more than $855 and that if defendant is entitled to recover anything she would not be entitled to recover more than $4,514.23.

Defendant's testimony tends to show the defective conditions alleged in her counterclaim. After cataloging the defects set out in her counterclaim, she testified that the mobile home had never been leveled; that you could see the ground through the floor; that "when they were putting it up, I told those men, 'Now this is not right and I do not want it' "; that after the mobile home was installed in such fashion, she complained to the plaintiff's president continually "from September to the last of December when he hung up on me and said Happy New Year"; that she ceased making monthly payments by reason of plaintiff's failure to make the necessary repairs to place the trailer in a usable condition; that she lived in the mobile home from September to May when plaintiff repossessed it by claim and delivery.

Julian T. Peel, President of Performance Motors, Inc., testified that defendant selected the mobile home she wished to buy, inspected it, and chose it in preference to others which were available; that "we did not imply any warranty other than the home would be as she saw it at that time"; that plaintiff only agreed to sell it to her "and block it up on her lot. If she had placed it in a mobile home park we would have hooked up the power and the water, but since she was putting it on a lot which had no facilities we could not do that as our people are not licensed electricians or plumbers."

Mr. Peel further testified that he inspected the home at defendant's request "to see what she was complaining about"; that the only thing he saw "worth noting" was a buckled panel in the hallway "which is just a sheet of four by eight plywood that had bowed off the wall"; that he agreed to repair it but defendant insisted on many other things being done at the same time and said she couldn't be bothered by men coming and going repairing defects one at a time; that she promised to send a

list of all alleged defects but never did so; that the mobile home in question had over twelve hundred square feet of floor space and the cash sale price was $10,000; that the contract signed by the parties contained the entire agreement—"[n]o warranty was implied otherwise. We set it up on her lot as she saw it sitting on our sales lot. We did not agree to keep it up for her or maintain it. Just like any other home, the person living there has to keep it up."

Plaintiff requested the following special instructions to the jury:

> "Ordinarily, the measure of damages for breach of warranty in the sale of personal property is the difference between the market value of the goods at the time and place of delivery, as delivered, and such value if the goods had complied with the warranty. Special damages may be recovered provided they were within the contemplation of the parties at the time the contract was executed and are properly pleaded. Where the purchaser does not allege the reasonable value of the chattel as warranted and its reasonable value as delivered, the damages are restricted to special damages pleaded and proved."

The trial judge refused to give the instruction requested, "except as incorporated in the charge," and charged the jury as follows: "Now, the court instructs you that the measure of damages on this issue, if you come to consider this issue, is as follows: Ordinarily the measure of damage to the contract is the amount of loss which a party to a contract would naturally and probably suffer from its nonperformance and which would in the minds of the parties at the time of its making reasonably and proximately flow from the breach of the contract. . . . " Again, later in the charge, the court stated: "Now the court instructs you that the measure of damage there is the amount which . . . the defendant, would naturally and probably suffer by reason of the non-performance of the contract and which would reasonably and proximately flow from the breach of the contract, that being the measure of damage. . . . "

Issues were submitted to and answered by the jury as follows:

> "1. What amount, if any, is the defendant indebted to the plaintiff?
>
> Answer: None.

2. Did the plaintiff breach the warranty as alleged in the answer?

Answer: Yes.

3. If so, what amount, if any, is the plaintiff indebted to the defendant?

Answer: $4,000.00 plus interest."

From judgment based on the verdict plaintiff appealed. The Court of Appeals awarded a new trial for failure and refusal of the trial judge to give the special instruction as requested by plaintiff and for charging the jury on the issue of damages as above set out. We allowed certiorari to review that decision.

*Donald P. Brock, Attorney for defendant appellant.*

*Darris W. Koonce, Attorney for plaintiff appellee.*

HUSKINS, Justice.

[1] The security agreement signed by defendant contains the following language as part of the "provisions" printed on the reverse side of the instrument itself: "Buyer further warrants and covenants that: 1. The Buyer admits, upon examination, that the Collateral is as represented by Seller and acknowledges acceptance and delivery thereof in good condition and repair." Plaintiff contends the security agreement was intended by the parties as a final expression of their agreement and that the quoted language constitutes a waiver by defendant of all warranties and renders incompetent her testimony with respect to the defective condition of the mobile home after it was installed on defendant's lot. Admission of her testimony is assigned as error.

Plaintiff's position on this point is unsound. Obviously, the security agreement was signed by defendant at plaintiff's place of business *before* the mobile home was delivered and installed. In light of that fact, the buyer at that time could not acknowledge "delivery thereof in good condition and repair." As a part of the contract of sale, plaintiff agreed to deliver the mobile home "and block it up on her lot." Until that was done plain-

tiff's obligations under the contract remained unfulfilled. Defendant's testimony was competent, not to contradict the terms of a written contract, but as evidence of additional consistent terms of the sale. "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented . . . (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." G.S. 25-2-202. Here, the evidence of both parties shows that the mobile home was to be delivered and set up on defendant's lot. Hence the security agreement was not intended "as a complete and exclusive statement of the terms of the agreement." This assignment is overruled.

[2]　Plaintiff's allegation of the sale and delivery of the mobile home at the agreed price, and defendant's admission that she purchased the goods, executed the note and security agreement, and refused to pay a portion of the purchase price agreed upon, makes out a prima facie case entitling plaintiff to go to the jury and, *nothing else appearing,* to recover the balance due on the note. *Joyce v. Sell,* 233 N.C. 585, 64 S.E. 2d 837 (1951). "The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." G.S. 25-2-301.

Here, to negate her obligation to pay the balance due on the note, defendant alleges (1) fraudulent representations inducing the purchase, (2) breach of express warranty, (3) breach of implied warranty of fitness, and (4) rescission of the contract due to plaintiff's breach of the warranties. We now examine her degree of success in proving these allegations.

[3]　There is no evidence of fraud, and the evidence is insufficient to show an express warranty by the seller. The only evidence in this respect is defendant's testimony that "the trailer was supposed to last a lifetime and be in perfect condition." A seller's language to that effect, if used in negotiating a sale, is ordinarily regarded as an expression of opinion in "the puffing of his wares," and does not create an express warranty. G.S. 25-2-313 (2) ; *Hollenbeck v. Fasteners Co.,* 267 N.C. 401, 148

S.E. 2d 287 (1966). Our prior decisions are in accord with the current provisions of the Uniform Commercial Code with respect to the creation of express warranties. G.S. 25-2-313; *Wrenn v. Morgan*, 148 N.C. 101, 61 S.E. 641 (1908) ; *Swift & Co. v. Aydlett*, 192 N.C. 330, 135 S.E. 141 (1926) ; *Potter v. Supply Co.*, 230 N.C. 1, 51 S.E. 2d 908 (1949).

[4]   The ordinary purpose for which a mobile home is used is residential. Here, the mobile home was sold and purchased for that purpose. "Unless excluded or modified (§ 25-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . . (2) Goods to be merchantable must be at least such as . . . (c) are fit for the ordinary purposes for which such goods are used. . . . " G.S. 25-2-314(1), (2). Plaintiff is a merchant with respect to the sale of mobile homes, and the security agreement executed by defendant contains no language, as permitted by G.S. 25-2-316, excluding or modifying the implied warranty of merchantability. Hence, the sale under discussion carried with it an implied warranty that the mobile home was fit for the purpose for which such goods are ordinarily used, *i.e.*, residential purposes. The Uniform Commercial Code in this respect accords with prior decisions of this Court on the subject. *Aldridge Motors, Inc. v. Alexander*, 217 N.C. 750, 9 S.E. 2d 469 (1940) ; *Swift & Co. v. Aydlett, supra; Swift & Co. v. Etheridge*, 190 N.C. 162, 129 S.E. 453 (1925) ; *Jewelry Co. v. Stanfield*, 183 N.C. 10, 110 S.E. 585 (1922) ; *Ashford v. Shrader*, 167 N.C. 45, 83 S.E. 29 (1914) ; *Medicine Co. v. Davenport*, 163 N.C. 294, 79 S.E. 602 (1913).

[5-7]   While there is no implied warranty when the buyer, before entering into the contract, examines the goods as fully as he desires, G.S. 25-2-316(3)(b), and has knowledge equal to that of the seller, *Driver v. Snow*, 245 N.C. 223, 95 S.E. 2d 519 (1956), this principle is not applicable to the facts here because the contract of sale imposed on the seller the obligation to deliver the mobile home and "block it up" on defendant's lot. Until that was properly done, fitness or unfitness for use as a home could not be ascertained by the buyer's examination and inspection of the goods on the seller's premises. Unless otherwise agreed, "[w]hen the seller is required . . . to send the goods to the buyer, the inspection may be after their arrival," G.S. 25-2-513(1) ; and the buyer is entitled to a reasonable time

after the goods arrive at their destination in which to inspect them and to reject them if they do not comply with the contract. *Parker v. Fenwick,* 138 N.C. 209, 50 S.E. 627 (1905). Moreover, defendant's down payment would not impair her right to inspect following delivery. G.S. 25-2-512(2). Here, delivery was not accomplished until plaintiff "blocked it up" on defendant's lot. Plaintiff could have cured the defects which rendered the mobile home unfit for the use for which it was sold by repairing the defective product it delivered, G.S. 25-2-508, but it failed to do so. For these reasons plaintiff may not now contend that defendant's inspection of the mobile home at plaintiff's place of business destroyed the implied warranty of fitness imposed by law upon the sale.

What remedies are available to defendant for breach of implied warranty of fitness? The answer to this question turns on whether defendant *accepted* the mobile home. This requires consideration of the Uniform Commercial Code's concept of rejection, acceptance, and revocation of acceptance.

[8-12] Acceptance is ordinarily signified by language or conduct of the buyer that he will take the goods, but this does not necessarily indicate that the goods conform to the contract. G.S. 25-2-606(1)(a). Acceptance may also occur by failure of the buyer "to make an effective rejection" after a reasonable opportunity to inspect. G.S. 25-2-606(1)(b). Effective rejection means (1) rejection within a reasonable time after delivery or tender and (2) seasonable notice to the seller. G.S. 25-2-602. Acceptance precludes rejection of the goods accepted and, if made with knowledge of a nonconformity, cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured. G.S. 25-2-607(2). Thus, the buyer may *revoke his acceptance* if (1) "the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured," G.S. 25-2-607(2), and (2) the nonconformity substantially impairs the value of the goods. G.S. 25-2-608(1). Revocation of acceptance must be made within a reasonable time after the buyer discovers, or should have discovered, the ground for it, *Hajoca Corp. v. Brooks,* 249 N.C. 10, 105 S.E. 2d 123 (1958), and it is not effective until the buyer notifies the seller of it. G.S. 25-2-608(2). A buyer who so revokes his acceptance is no longer required to elect between revocation of acceptance on the one

hand and recovery of damages for breach of implied warranty of fitness on the other. Both remedies are now available to him. G.S. 25-2-608.

The Uniform Commercial Code does not speak of rescission, as such. We need not now decide whether a buyer may still obtain a judicial rescission of the contract by virtue of pre-Code concepts of law or equity which have not been displaced and therefore continue under the Code as an "invalidating cause" supplementing the provisions of the Code within the meaning of G.S. 25-1-103. Assuming without deciding that rescission remains available to the buyer as a remedy by virtue of G.S. 25-1-103, defendant's allegation of "rescission" will be given effect here as an allegation of "revocation of acceptance" since that Code concept more nearly reflects the claims asserted by the defendant. 2 R. Anderson, Uniform Commercial Code, § 2-711:19 at 420 (2d Ed., 1971). *See Lanners v. Whitney*, 247 Ore. 223, 428 P. 2d 398 (1967).

[13, 14] Applying the foregoing principles to the evidence in this case, if defendant (1) made an effective rejection of the mobile home, or (2) justifiably revoked her acceptance of it, she has a right to recover "so much of the price as has been paid" plus any incidental and consequential damages she is able to prove. G.S. 25-2-711(1); G.S. 25-2-715. On the other hand, if defendant did not reject but accepted the mobile home, and there has been no revocation of acceptance, she is obligated to pay the balance due on the contract price, and she is limited on her counterclaim to recovery of damages for breach of implied warranty of fitness. The measure of damages in that event is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless circumstances show damages of a different amount," G.S. 25-2-714(2), plus incidental damages and such consequential damages as were within the contemplation of the parties. G.S. 25-2-715; *Hendrix v. Motors, Inc.*, 241 N.C. 644, 86 S.E. 2d 448 (1955); *Harris v. Canady*, 236 N.C. 613, 73 S.E. 2d 559 (1952).

[15, 16] Here, defendant's evidence is insufficient to support a finding that she *rejected* the mobile home. She testified that when the mobile home was installed she told plaintiff's agent "now this is not right and I do not want it." While this statement could have been effective as a rightful rejection, G.S. 25-2-

601(a), she did not pursue that remedy. Instead, her evidence tends to show she moved into the mobile home, all the while complaining of numerous defects—some of which plaintiff attempted but failed to correct—and made three monthly payments under the terms of the contract. She complained of the defects "continually from September to the last of December [1968] when he [plaintiff] hung up on me and said Happy New Year." Thereafter defendant made no further payments, and plaintiff made no further attempt to correct the defects or to collect the monthly payments until May 1969 when the mobile home was repossessed and sold at public auction for $9115. This evidence, considered in the light most favorable to defendant, would permit a jury to find that she initially accepted the mobile home on the reasonable assumption that plaintiff would correct the nonconforming defects and subsequently revoked her acceptance by reason of plaintiff's failure to do so. Constant complaints from September to December with cessation of payment would seem to constitute sufficient notice of revocation of acceptance. "Any conduct clearly manifesting a desire of the buyer to get his money back is a sufficient notice to revoke." 2 R. Anderson, Uniform Commercial Code, § 2-608:16 at 245 (2d Ed., 1971). Furthermore, "[a] tender of the goods by the buyer to the seller is not an essential element of a revocation of acceptance. All that is required by the Code is a notification of revocation." Ibid., § 2-608:18 at 246.

Since there must be a new trial, we have made no attempt to consider *seriatim* plaintiff's several assignments of error. With respect to the court's charge as given on the measure of damages, and plaintiff's request for special instructions on the issue of damages which the court declined to give, it suffices to say that both are incomplete and inadequate and neither should have been given. At the next trial issues should be submitted to determine, among other things: (1) whether defendant accepted the goods; (2) whether plaintiff breached the implied warranty of fitness; (3) whether defendant justifiably revoked her acceptance; (4) the amount, if any, plaintiff is entitled to recover of defendant on the purchase price; and (5) the amount of damages, if any, defendant is entitled to recover of plaintiff. We have already stated the correct measure of damages upon the permissible alternative findings.

The parties may be permitted to amend their pleadings, if they so desire, to conform to the evidence. G.S. 1A-1, Rule 15, Rules of Civil Procedure.

The decision of the Court of Appeals awarding a new trial is modified to conform to this opinion and, as modified, affirmed.

Modified and affirmed.