RALPH W. DAVIS v. COLONIAL MOBILE HOMES

No. 7523DC495

(Filed 17 December 1975)

1. **Uniform Commercial Code § 19— reasonable time for inspection — payment before delivery**

    When a seller ships purchased goods to the delivery point, the buyer is entitled to a reasonable time after the goods arrive at their destination in which to inspect them and to reject them if they do not comply with the contract; the fact that the buyer paid the seller before delivery does not constitute an acceptance of the goods or impair the buyer's right to inspect or any of his remedies. G.S. 25-2-512(2).

2. **Uniform Commercial Code § 20— revocation of acceptance of mobile home**

    Plaintiff within a reasonable time revoked his acceptance of a mobile home where it was delivered on 7 June, numerous parts of the

home were out of line and the home leaked, defendant seller sent out persons to make repairs on four occasions, plaintiff on 3 July notified defendant that he demanded immediate replacement of the home or a refund of all money paid, defendant again sent workers to make repairs on 29 July but plaintiff refused to allow them to do so, and plaintiff moved out of the home after three months.

3. **Uniform Commercial Code § 20— rejection of revocation of acceptance — recovery of price — damages**

If a buyer made an effective rejection of a mobile home or justifiably revoked his acceptance of it, he has a right to recover so much of the price as has been paid plus any incidental and consequential damages. G.S. 25-2-711(1); G.S. 25-2-715.

4. **Uniform Commercial Code § 20— revocation of acceptance — no duty to allow repairs**

Where a mobile home was purchased on 18 May and delivered on 7 June and defendant seller was thereafter unable to tell plaintiff buyer when the unit would be properly repaired, defendant did not make a conforming delivery within a "reasonable time" or within the "contract time," and after plaintiff revoked his acceptance of the home, he was under no obligation to permit defendant to repair the defects and make a binding re-tender thereof to plaintiff.

APPEAL by both plaintiff and defendant from *Osborne, Judge.* Judgment entered 27 January 1975 in District Court, ALLEGHANY County. Heard in the Court of Appeals 25 September 1975.

This is the second appeal arising out of this litigation. In *Davis v. Enterprises* and *Davis v. Mobile Homes*, 23 N.C. App. 581, 209 S.E. 2d 824 (1974), we ordered a new trial for a determination of whether there had been a rejection or revocation of acceptance.

The lawsuit involves a dispute between the purchaser (plaintiff) of a mobile home and the seller (defendant). Plaintiff complains that, due to defendant's negligent mishandling in shipment and installation, the unit is irreparably damaged and uninhabitable. Plaintiff testified at the first trial that he had paid $5,359.90 in cash for the mobile home and had incurred $1,000 incidental expenses. At the second trial plaintiff testified further with respect to his incidental and consequential damages.

Plaintiff further stated that the unit had been delivered and installed on the lot by defendant on 7 June 1973, and when delivered to the site one tire was flat. Plaintiff testified that defendant's employee told him that ". . . the driver who de-

livered the mobile home to my property from Yadkinville pulled the mobile home on the flat tire 'all the way.' . . ." Once the unit had been installed plaintiff had to wait three weeks in order to inspect the interior because ". . . no keys were delivered with the mobile home." When plaintiff finally obtained the keys he found the cabinets out of line and claims they "would not make a tight seal, and the outer edge of the door of the refrigerator was about a quarter-inch higher than the top of the refrigerator. The windows would not shut a tight seal, and the front door would not stay shut. When you would shut the front door, the walls would vibrate just like the studding had been torn completely loose from the rafters. Along the upper edge and the right rear corner of the outside of the mobile home, you could stick your fist up between the paneling and the frame of the trailer. On the bottom at the right rear corner, the corrugated metal exterior was bent out of shape and pulled away from the frame. There was an indentation less than $\frac{1}{4}$ inch deep in the left front corner of the frame and the 'I' beam running under the chassis was completely warped. The 'I' beam on the left-hand side was twisted and bent and bowed out. The windows wouldn't shut, the floors were buckled, and the rafters on the top were warped and bent out of shape; they were warped into a kindly 'S' shape."

"When it rained the floors were flooded. Water ran out from under the paneling into the inside. My daughter packed towels and stuff under the paneling to keep water out of the shoes. After about an hour, the circuit breakers in the electrical panels started flickering off, so I pulled the main switch. There was water all over the floors, in the hall and kitchen, bathroom and both bedrooms. After each rain, water would drain from the walls for from one to three hours—from between the outer aluminum skin and the inner walls. . . ."

". . . Defendant sent an employee named Paul Stanley to install a hot water heater. He also smeared a substance similar to tar on the roof, but it only stopped about 50% of the leaking. Water was still running down between the inner and outer walls into the bathroom, the center bedroom and the hall. Water continued to cause the circuit breakers to kick off, and water continued to drip out from between the walls after each rain. One night I locked the door and went to bed. During the night a breeze rocked the trailer and the door came open. I noticed a crack across the kitchen floor. None of the damages I have

described were visible when I inspected the mobile home at Yadkinville prior to purchasing it."

Plaintiff remained in the trailer for approximately three months and finally moved out in September of 1973. Prior to moving out, plaintiff, through a letter from his attorney, on or about 3 July 1973, demanded replacement or, in the alternative, a refund.

Defendant's evidence indicated that he had made efforts to repair; though they were finally refused access to the unit for repair purposes by plaintiff after the lawsuit had been initiated.

In the first action, the District Court awarded plaintiff $900 for defendant's breach of the contract.

Subsequent to the first appeal, plaintiff on 3 December 1974, amended his complaint and averred that he had ". . . seasonably and within a reasonable time notified defendant of his rejection [of the unit] thereof." Alternatively, plaintiff alleged that ". . . if the Court should find that plaintiff initially accepted said mobile home (which is denied), then plaintiff seasonably and within a reasonable time revoked any such acceptance."

Plaintiff seeks the entire purchase price paid by him to defendant and incidental and consequential damages.

Based on the transcript of the first trial and the additional evidence presented in the second trial, the court found facts and concluded that plaintiff made an effective rejection of said mobile home within a reasonable time after delivery, and after seasonable notice to the seller and is entitled to recover the purchase price of said mobile home from the defendant. The Court did not award any incidental and consequential damages and did not find any facts with respect to this portion of plaintiff's case.

From said judgment, both plaintiff and defendant appealed.

*Edmund I. Adams for plaintiff.*

*Arnold L. Young for defendant.*

MORRIS, Judge.

Both plaintiff and defendant take exception to various aspects of the District Court's judgment and bring forward

for our consideration several assignments of error. Grouping the parties' contentions by subject matter, we have before us these questions:

     (1) Did the trial court prejudicially err in finding a rejection by the plaintiff buyer?

     (2) Where the plaintiff buyer rejects or revokes acceptance does he have the right to incidental and consequential damages?

     (3) Where the buyer rejects or revokes his acceptance of goods, does this defendant seller have the ancillary right to cure and repair the alleged defects and then make a binding "retender" or a "continuing tender"?

[1] Our Supreme Court, interpreting the applicable provisions under the Uniform Commercial Code, has held that when a seller, as in this case, ships the purchased goods to the delivery point, ". . . the buyer is entitled to a reasonable time after the goods arrive at their destination in which to inspect them and to reject them if they do not comply with the contract." *Motors, Inc. v. Allen,* 280 N.C. 385, 394-395, 186 S.E. 2d 161 (1972) ; also see *Davis v. Enterprises* and *Davis v. Mobile Homes, supra,* at 587. The mere fact that plaintiff Davis paid defendant before delivery ". . . does not constitute an acceptance of goods or impair the buyer's right to inspect or any of his remedies." G.S. 25-2-512(2) ; also see *Motors, Inc. v. Allen, supra,* at 395.

     The court found as a fact that plaintiff had ". . . notified the defendant by letter dated July 3, 1973 that he demanded immediate replacement of said mobile home, or in the alternative a refund of all money paid. That thereafter on the 29th day of July 1973 defendant sent a crew of workers to said mobile home to make repairs and adjustments, but the defendant refused to permit said workers to attempt to make repairs and adjustments. That prior to this time the defendant had sent an employee to mobile home of the plaintiff to make repairs on four different occasions. That after ninety days the plaintiff moved out of said mobile home, and has lived in said mobile home only during the summer months." It is not clear from the record whether the on-site repair visits transpired prior to or subsequent to the 3 July 1973 letter to defendant. The evidence, however, is plenary that plaintiff was justifiably dissatisfied with the delivered product and that defendant was

well aware of the dissatisfaction. Defendant's district manager, Joey Odell, testified that "[s]*hortly after delivery,* I made a call on Mr. Davis. He had made some complaints. . . . [H]e had complained . . . that the water heater would not work. . . . Mr. Davis also made other complaints. . . . I [also] received a complaint from the Consumer Protection Division of the Attorney General's Office. . . ." (Emphasis supplied.) When Odell first tried to check out the complaints plaintiff was not there, but he noted that on his second trip to the site he found plaintiff there. "He had numerous complaints. He complained about the closet doors in the bedrooms not being adjusted properly and catching on the bottom—the doors would not close or open. I did some work on the doors. . . . I did all the work I could that day and told Mr. Davis that we would send a service crew up to finish the work. I did not tell him when to expect the crew. At the time I was kind of short on service personnel. I told him I would get to it as soon as I possibly could. . . ."

Defendants returned to the mobile home on 29 July 1973, almost two weeks after plaintiff initiated this action. On this visit they wanted ". . . to see what else we needed to do." Davis, after calling his attorney, would not let defendants work on the unit. Odell further testified that plaintiff ". . . did not want any work performed on the home to get it to his satisfaction."

**[2]** We think the evidence in this case supports a conclusion that plaintiff revoked his acceptance. The fact that plaintiff stayed in the unit after allegedly revoking or rejecting the unit does not alone necessarily vitiate any of the buyer's rights. In an analogous case, the State Supreme Court held that the ". . . evidence is insufficient to support a finding that she *rejected* the mobile home. . . ." where, notwithstanding the fact that she told the seller that "'. . . this is not right and I do not want it,'" she moved into the home and made three payments on the unit. *Motors, Inc. v. Allen, supra,* at 396-397. Though finding no rejection the Court nonetheless held that "[t]his evidence, considered in the light most favorable to defendant, would permit a jury to find that she initially accepted the mobile home on the reasonable assumption that plaintiff [seller] would correct the nonconforming defects and subsequently revoked her acceptance by reason of plaintiff's failure to do so." *Id.* at 397.

Davis v. Mobile Homes

[3] However, any error committed by the District Court in finding a rejection instead of a revocation of acceptance must be deemed harmless in view of our determination that the evidence warrants a finding of revocation. In either case the plaintiff's relief is the same. "A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them." G.S. 25-2-608(3). Thus, if the buyer " . . . made an effective rejection of the mobile home, or . . . justifiably revoked . . . [his] acceptance of it, . . . [he] has a right to recover 'so much of the price as had been paid' plus any incidental and consequential damages . . . [he] is able to prove, G.S. 25-2-711(1); G.S. 25-2-715." *Motors, Inc. v. Allen, supra,* at 396; also see *Davis v. Enterprises* and *Davis v. Mobile Homes, supra,* at 588.

[4] Defendant contends that he has the right to repair and cure the defects under a continuing tender or re-tender theory notwithstanding plaintiff's notification of rejection or revocation of acceptance.

G.S. 25-2-508 provides that:

"(1) Where any tender or delivery by the seller is rejected because nonconforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.

(2) Where the buyer rejects a nonconforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender."

In this case, plaintiff paid defendant on 18 May 1973 and the defendant delivered the unit on 7 June 1973. When the defendant's employee Odell went to see plaintiff after delivery he could not tell plaintiff when he would be able to repair the unit. He explained that ". . . it is quite hard to tell the individual or customer when you can possibly get to doing work." In fact, Mr. Richard Hensley, defendant's regional service manager, testified that he did not ". . . know how long it would take to make all the repairs necessary to get the mobile home back in good condition. . . . " By their own testimony, defendants were *not able to and did not make a conforming delivery within a* "reasonable time" or within the "contract time." Under these

circumstances, the plaintiff buyer has no further obligations to purchase or accept any mobile home from defendant, whether the original unit repaired or a replacement. See G.S. 25-2-602 (b), (c) ; G.S. 25-2-608 (3).

On defendant's appeal: Affirmed.

On plaintiff's appeal: Remanded for hearing and determination on plaintiff's prayer for incidental and consequential damages.

Judges HEDRICK and ARNOLD concur.