CLYDE BURNHAM & others[1] vs. MARK IV HOMES, INC.[2]

Franklin. May 7, 1982. — November 5, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Consumer Protection*, Unfair act or practice, Exemption from liability, Damages. *Practice, Civil*, Consumer protection. *Evidence*, Relevancy and materiality. *Damages*, Consumer protection case, Mitigation. *Words*, "Primarily and substantially within the commonwealth," "Goods."

In an action by purchasers against the manufacturer of certain modular homes sold by a dealer in New Hampshire for delivery and installation on foundations in Massachusetts, the judge erred in dismissing the plaintiffs' claims under G. L. c. 93A on the basis that the conduct alleged to have constituted a breach of the implied warranty of merchantability had not occurred "primarily and substantially within the commonwealth," thereby invoking the exemption from liability appearing in G. L. c. 93A, § 3 (1) (*b*). [579-582]

Evidence at the trial of claims under G. L. c. 93A arising from breach of the implied warranty of merchantability in the manufacture of modular homes would have warranted findings (a) that the defendant, after receipt of the plaintiffs' demand for relief, had knowledge or reason to know that its conduct of which the plaintiffs complained violated G. L. c. 93A, § 2, and (b) that the defendant's decision not to offer a settlement before trial was made in bad faith. [582-584]

No error appeared in the direction of a verdict against a manufacturer of certain modular homes on its counterclaim against a purchaser of six of the homes, alleging that defects in the homes had resulted from improper placement and erection, in the absence of evidence that anyone other than the manufacturer's dealer had erected the homes or that the dealer was acting as the purchaser's agent in doing so. [584]

---

[1] The other plaintiffs are Grace Burnham, John and Marguerite Butler, Omar Chaisson, Ralph and Shirley Duteau, Stanley and Christine Garbiel, James and Sharon Heath, Ronald Stone, Pauline Woodford, and Merle and Geneva Parker.

[2] The count against a second defendant, Eugene Kapper, doing business as Snow's Modular and Mobile Home Sales, was dismissed on the plaintiffs' motion, and no issue is raised in this appeal with regard to that dismissal.

At the trial of an action against the manufacturer of certain modular homes, in which the plaintiffs alleged that homes purchased by them were not watertight and were thus unfit for habitation, the judge properly admitted testimony by a former dealer in homes manufactured by the defendant to the effect that, at a time prior to the sales of homes to the plaintiffs, he had notified the manufacturer's sales manager of leakage problems in other homes sold by him. [584-585]

At the trial of an action against the manufacturer of certain modular homes, in which the plaintiffs alleged that homes purchased by them were not watertight and were thus unfit for habitation, jury instructions respecting mitigation of damages were not prejudicial to the defendant [585-587], instructions as to the measure of damages were not misleading [587], and the denial of the defendant's request for interrogatories regarding the amount of damages to be awarded to each of several plaintiffs was neither prejudicial to it nor an abuse of discretion [587-588].

Where a judge erred in dismissing claims under G. L. c. 93A on the basis that the exemption from liability appearing in c. 93A, § 3 (1) (*b*), was applicable, this court remanded the case for the judge to determine the amount of reasonable attorney's fees and costs to which the plaintiffs were entitled; to determine whether the defendant had refused to grant relief to the plaintiffs in bad faith with knowledge or reason to know that the conduct complained of violated c. 93A, § 2; and, if appropriate, to assess damages under c. 93A, § 9 (3), in a multiple of the amount fixed by the jury's verdict. [588]

CIVIL ACTION commenced in the Superior Court on March 24, 1976.

The case was tried before *Smith,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Edward M. Swartz (Marguerite M. Dolan & Richard B. Parker* with him) for the plaintiffs.

*David Burres* for the defendant.

*Francis X. Bellotti,* Attorney General, amicus curiae, & *John T. Montgomery, Susan H. Frey & John Roddy,* Assistant Attorneys General, submitted a brief.

LYNCH, J. Clyde Burnham and fourteen other plaintiffs, representing nine households, purchased nine modular

homes[3] which had been manufactured by Mark IV Homes, Inc.[4] (Mark IV), in a factory in Pennsylvania. The plaintiffs, seeking to recover for negligence, breaches of warranty, and violations of G. L. c. 93A, brought suit against Mark IV. At the close of the plaintiffs' case, the trial judge allowed Mark IV's motion to dismiss the c. 93A claims.[5] The jury returned a verdict for the plaintiffs on the remaining counts. The plaintiffs appealed claiming that the judge had erred in dismissing their c. 93A counts. Mark IV also appealed alleging various errors of law. We transferred the case here on our own motion. We affirm the judgment against Mark IV on its counterclaim. We conclude, further, that the exemption relied on by Mark IV, G. L. c. 93A, § 3 (1) (*b*), does not apply, and consequently remand for further proceedings as to this aspect of the case.

The jury verdict established that Mark IV breached the implied warranty of merchantability. See G. L. c. 106, § 2-314. In the circumstances, that breach was a violation of G. L. c. 93A, § 2. The plaintiffs, therefore, are entitled to recover their reasonable attorney's fees and costs, G. L. c. 93A, § 9 (4), which the judge shall determine on remand. We remand the case also for him to determine whether, upon demand, Mark IV refused to grant relief to the plaintiffs in bad faith with knowledge or reason to know that the act or practice complained of violated G. L. c. 93A, § 2, and for him to assess damages if appropriate in accordance with that determination.

1. *Background.* The evidence tended to prove the following. Eugene Kapper, doing business as Snow's Modular and Mobile Home Sales (Kapper) from his place of business in Winchester, New Hampshire (a few miles north of the

---

[3] These homes were designed to be transported in two sections to a homesite, and placed on permanent foundations.

[4] Doing business as Homes by Dunhill.

[5] Since the motion was filed during trial and pressed by the defendant at the close of the plaintiffs' case, it was not error for the judge to rule on the motion at that time, although it would have been preferable for him to have heard all the evidence before disposing of the motion.

Massachusetts border), sold modular homes manufactured by Mark IV as Mark IV's dealer. The plaintiff Stone purchased at least six Mark IV homes from Kapper over a period of several months beginning in November, 1973. He first looked at a model of these homes located on Kapper's lot, and then placed orders for the units to be delivered in Massachusetts. Stone paid a deposit to Kapper's agent, who was located in Massachusetts. Stone had Kapper transport the units to Orange and assemble them on foundations prepared by Stone. Within one year of his first purchase from Kapper, Stone had sold five of the units to other plaintiffs in this action, retaining one for his own use.[6] The plaintiffs Heath, Chaisson, and Garbiel purchased their modular units directly from Kapper, after viewing models of those units at Kapper's lot in New Hampshire. These plaintiffs also had Kapper transport their units to sites in Massachusetts and assemble them on foundations here.

At various times within a few months of installation, the roofs of the plaintiffs' units began to leak. During the winter, snow built up on the relatively flat roofs of their units and, since these roofs did not overhang the sides of the units, melted snow ran down their outside walls, saturating the walls and occasionally covering walls, windows, and doors with sheets of ice. Water pipes in some of the units also froze in the winter, allegedly due to improper placement and insulation.

Employees of Kapper and, eventually, the plaintiffs themselves, attempted to solve the leakage problems by applying liquid sealers to some of the roofs. These attempts did not prevent leakage for any significant length of time. Other plaintiffs had new roofs laid over the old, which stopped the leakage. By letters dated September 3, 1975, an attorney representing Stone and the five households that had purchased units from him notified both Kapper and Mark IV of

---

[6] Stone sued Mark IV solely in his capacity as the "consumer" of the home he retained, and not as a purchaser of homes for resale. Compare §§ 9 and 11 of G. L. c. 93A.

the problems with their units, and of their intention to file suit if those problems were not remedied. Mark IV sent two workmen who made attempts at repairing some of the units by caulking and coating the roofs. The workmen, however, did not replace any of the plaintiffs' roofs. Leakage problems continued, Mark IV declined to make further repairs, and this suit resulted. At trial, Mark IV asserted that the flaws in the plaintiffs' units (at least those involving leakage through the roofs) were the result of improper installation, for which Stone allegedly was responsible in part.[7] We will discuss other evidence as it is relevant to the issues raised by this appeal.

2. *Exemption from G. L. c. 93A liability.* Mark IV based its motion to dismiss the plaintiffs' c. 93A claims solely on its entitlement to the exemption from liability created by c. 93A, § 3 (1) (*b*).[8] Since the judge granted Mark IV's motion without making findings of fact, we assume (with the parties) that he accepted Mark IV's argument. The plaintiffs argue that the judge erred in granting Mark IV's motion. We agree.

The parties stipulated at trial that the only issue raised by the judge's granting of Mark IV's motion to dismiss is whether the transactions and actions complained of by the plaintiffs

---

[7] Stone could not have been responsible, of course, for the installation of those units purchased directly from Kapper by the Heaths, Chaisson, and the Garbiels, and these plaintiffs signed releases to that effect.

[8] The pertinent provisions of G. L. c. 93A, § 3, as amended by St. 1969, c. 814, § 2, are as follows:

"(1) Nothing in this chapter shall apply to

" . . . .

"(*b*) trade or commerce of any person of whose gross revenue at least twenty per cent is derived from transactions in interstate commerce, excepting however *transactions and actions which (i) occur primarily and substantially within the commonwealth,* and (ii) as to which the Federal Trade Commission . . . has failed to assert in writing within fourteen days of notice to it and to said person by the attorney general its objection to action proposed by him and set forth in said notice; or

"(*c*) transactions or actions by any person who shows that he has had served upon him by the Federal Trade Commission a complaint . . . .

"(2) For the purpose of this section *the burden of proving exemption from the provisions of this chapter shall be upon the person claiming the exemption*" (emphasis supplied).

occurred "primarily and substantially within the common-wealth." G. L. c. 93A, § 3 (1) (*b*) (i). Section 3 (2) states that "the burden of proving exemption from the provisions of this chapter shall be upon the person claiming the exemp-tion." In order to prove its entitlement to the exemption from liability contained in § 3 (1) (*b*), a defendant in a c. 93A claim must prove, not only that it derives twenty percent or more of its gross revenue from interstate commerce, but also that the "transactions and actions" complained of did *not* occur "primarily and substantially within the common-wealth." The Legislature's use of the terms "primarily and substantially," precludes, at a minimum, a construction of § 3 that would allow a c. 93A action in every instance in which the defendant's transactions and actions "within the commonwealth" would subject him to the jurisdiction under our long-arm statute, G. L. c. 223A. The facts of the case before us do not require us to define the outer bounda-ries of those transactions and actions which may be held to have occurred primarily and substantially within the Com-monwealth, because the evidence was insufficient to warrant a finding that Mark IV's actions and transactions constituting violations of G. L. c. 93A, § 2, did not occur primarily and substantially within the Commonwealth.[9] Accordingly, the judge erred in granting Mark IV's motion to dismiss the plaintiffs' G. L. c. 93A claims.

One of the theories on which the plaintiffs' case was sub-mitted to the jury was that Mark IV had breached the im-

---

[9] The Attorney General, in an amicus brief, urges us to set forth a list of factors similar to those considered by courts in choice of law situations (see Restatement [Second] of Conflict of Laws § 6 [1971]), to be used in deter-mining whether a particular action or transaction occurred primarily and substantially within the Commonwealth. The Attorney General notes that, in the context of suits brought by businessmen under § 11 of G. L. c. 93A, several Federal courts have used what appears to be a variant of such an analysis, and concluded that recovery under c. 93A was barred by the provisions of § 3 (1) (*b*). See, e.g., *Boston Super Tools* v. *RW Technologies,* 467 F. Supp. 558 (D. Mass. 1979); *U.S. Broadcasting* v. *National Broadcasting,* 439 F. Supp. 8 (D. Mass. 1977). Our resolution of the issue raised by the plaintiffs in this case does not require us to con-sider the Attorney General's suggestions in depth at this time.

plied warranty of merchantability set forth in G. L. c. 106, § 2-314. The Attorney General, pursuant to the authority granted him by G. L. c. 93A, § 2 (c), has promulgated a regulation declaring that "[i]t shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a warranty."[10] Breach of an implied warranty of merchantability therefore constitutes an unfair and deceptive act or practice under G. L. c. 93A, § 2. *Hannon* v. *Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 821 (1982).

The sales of the modular homes to the plaintiffs constituted "transactions in goods" under G. L. c. 106, § 2-102, because those units were "movable at the time of identification to the contract for sale" and hence are "goods" as defined in c. 106, § 2-105 (1). *Fuqua Homes* v. *Evanston Bldg. & Loan*, 52 Ohio App. 2d 399, 403-404 (1971). Mark IV does not dispute that it is a merchant with respect to goods of that kind. G. L. c. 106, § 2-314 (1). Lack of privity between Mark IV, a manufacturer, and the plaintiffs, is no longer a defense. G. L. c. 106, § 2-318. Mark IV therefore impliedly warranted that the modular home units sold to the plaintiffs would be "fit for the ordinary purposes for which such goods are used" (G. L. c. 106, § 2-314 [2] [c]), i.e., for residential purposes. See *Performance Motors, Inc.* v. *Allen*, 280 N.C. 385, 394 (1972) (mobile home). Based on the evidence introduced at trial, the conclusion was warranted that the modular units manufactured by Mark IV and sold to the plaintiffs were not fit for residential purposes at the time of sale because the roofs of those units were not watertight.

The question dispositive of the plaintiffs' appeal is whether Mark IV presented evidence warranting a finding that its breach of the implied warranty of merchantability did not occur "primarily and substantially within the commonwealth." G. L. c. 93A, § 3 (1) (b) (i). The evidence is un-

---

[10] Regulation VII B, 20 Code Mass. Regs., Part 5, at 28 (1975), currently found in 940 Code Mass. Regs. § 3.08 (2) (1978).

disputed that the sales of Mark IV units to the plaintiffs included delivery to sites in Massachusetts and installation on foundations here. As Mark IV's owner's manual makes clear, the defendant intended that delivery and installation of its units would be the responsibility of its dealers. Each of the plaintiffs' units was delivered and installed by Kapper, a dealer of Mark IV units. The sales of the plaintiffs' units could not have been completed until delivery and installation had taken place. The transactions and actions of Mark IV constituting a breach of the implied warranty of merchantability therefore occurred, not only "primarily and substantially," but entirely, in Massachusetts. Hence, the judge erred in holding that Mark IV had met its burden of proving its entitlement to the exemption from c. 93A liability found in § 3 (1) (*b*). On the contrary, the uncontroverted evidence establishes that, with respect to the implied warranty of merchantability, Mark IV's actions and transactions occurred within the Commonwealth and, based upon the jury verdict, were unfair or deceptive acts or practices under G. L. c. 93A, § 2.[11] As a result, Mark IV is liable to the plaintiffs under G. L. c. 93A, § 9.

3. *Multiple damages, attorney's fees, and costs.* The plaintiffs' right to recover under G. L. c. 93A, § 2, entitles them to an award of reasonable attorney's fees and costs incurred in asserting their rights. G. L. c. 93A, § 9 (4).[12] The plaintiffs, while conceding that their actual damages have been established by the jury's verdict, assert that they are entitled, in addition, to multiple damages under G. L. c. 93A, § 9 (3). Under G. L. c. 93A, § 9 (3), as amended through St. 1979, c. 406, § 2, the judge may award up to three but not less than two times the amount of the plaintiffs' actual damages if he finds that "the use of employment of the [unfair or deceptive] act or practice was a willful or

---

[11] But see *State ex rel. Tierney* v. *Ford Motor Co.*, 436 A.2d 866, 876-877 (Me. 1981).

[12] The defendant did not attempt to limit the award of fees and costs by making a written offer of settlement. See G. L. c. 93A, § 9 (4).

knowing violation of [c. 93A, § 2], or that *the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated [§ 2]*" (emphasis supplied). Nothing in the record suggests that Mark IV's conduct constituted a wilful or knowing violation of G. L. c. 93A, § 2, nor do the plaintiffs make such an assertion. They rely instead on the italicized clause quoted above.

This alternative basis for an award of multiple damages "is an attempt to promote prelitigation settlements by making it unprofitable for the defendant either to ignore the plaintiff's request for relief or to bargain with the plaintiff with respect to such relief in bad faith. The knowledge or reason to know is that which exists after receipt of the complaint and not at the time of the alleged violation. The standard is objective and requires the defendant to investigate the facts and consider the legal precedents." *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 627-628 (1978). In this case, the demand for relief referred to in the statute is the demand letter the plaintiffs sent to Mark IV on September 3, 1975.[13] In response to that letter, Mark IV sent two workmen who attempted to remedy the conditions which resulted in the plaintiffs' complaint. By letter dated November 10, 1975, Mark IV informed the plaintiffs that its repairs were nearly completed. That letter concluded as follows: "Our repairmen reported that in every case where there were leaks, it was a result of improper set-up. Considering those facts, if [the plaintiffs] expect any further remedy . . . it should come from the dealer who sold the homes to them." At trial, Mark IV took the position that the transactions and actions complained of by the plaintiffs occurred primarily and substantially in New Hampshire, where Kapper's dealership was located, and that Mark IV therefore was immune from G. L. c. 93A liability.

---

[13] Such a demand is unnecessary where the defendant does not maintain a place of business or keep assets within the Commonwealth. G. L. c. 93A, § 9 (3).

The judge would have been warranted in finding that Mark IV had "reason to know" that certain of the allegations stated a claim of violations of G. L. c. 93A, § 2,[14] and that Mark IV's decision not to make a written offer of settlement before trial[15] was made in bad faith. The statute provides that these questions be answered by the judge. We remand this aspect of the case for such a determination.

4. *Grant of directed verdict.* In its appeal, Mark IV argues that the judge erred in granting a directed verdict in favor of Ronald Stone with respect to a counterclaim made by Mark IV against Stone. In that counterclaim, Mark IV had alleged that Stone "caused, or . . . permitted, said mobile home units to be improperly erected and improperly placed on site prior to sale," and that the damage to the plaintiffs' property resulted from this improper placement and erection. Mark IV failed to sustain its burden of proof in regard to this claim. There is no dispute that each of the units in which the plaintiffs resided was erected by employees of Kapper, a dealer of Mark IV homes, or that Mark IV homes always were erected by the dealer. The defendant directs us to no evidence from which a trier of fact reasonably could conclude that Stone erected the homes or that Kapper, in erecting the six homes originally sold to Stone, was acting as Stone's agent. There was no error.

5. *Admission of testimony relevant to notice.* Mark IV claims error in the admission of the testimony of Lowell Baldwin who, as a New York dealer of homes manufactured by Mark IV, had sold three such modular homes with roofs substantially similar to those of the plaintiffs' units. Baldwin testified, over Mark IV's objection, that in March, 1974, he

---

[14] The regulation of the Attorney General, whereby breaches of warranty constitute unlawful acts under § 2 of G. L. c. 93A, was promulgated in 1971.

[15] Since Mark IV maintained no place of business and did not keep assets within the Commonwealth, it could have limited any award of damages under the statute by making a reasonable written offer of settlement and paying the rejected tender into court as soon as practicable after receiving notice of commencement of suit against it. G. L. c. 93A, § 9 (3).

had notified a sales manager employed by the subsidiary of Mark IV (Homes by Dunhill), which manufactured the units sold to the plaintiffs, of problems with leakage through the roof of the first Mark IV home he sold, and later informed him of leakage problems involving other Mark IV units. The judge offered to give the jury a limiting instruction regarding the purpose of Baldwin's testimony. Mark IV, insisting that Baldwin's testimony was inadmissible, declined the judge's offer. Nonetheless, after dismissing the c. 93A claims the judge restricted the jury's use of Baldwin's testimony to the issue of whether Mark IV had notice that there were leakage problems with its units. On appeal, Mark IV argues that notice was not at issue in the case, and that to admit Baldwin's testimony therefore was error.

Evidence was introduced from which a trier of fact reasonably could conclude that Stone bought two Mark IV units in April, 1974, and later resold one of them to the Burnhams. The plaintiffs alleged that Mark IV negligently tested, inspected, marketed, advertised, and sold the homes.[16] Whether Mark IV reasonably should have known of these leakage problems at the time of the sale of its units to Stone in April, 1974, is relevant to the issue whether Mark IV was negligent in the testing, inspection, marketing, and sale of the homes. Baldwin's testimony regarding complaints he made to Mark IV's employee in March, 1974, bears on that issue. Since notice was therefore an issue in the case, the defendant's claim of error is without merit.

6. *Jury instructions.* Mark IV objected to the judge's instruction to the jury that, with respect to mitigation of damages, "a plaintiff cannot sit idly by and let damages increase without doing something about it. . . . [T]he plaintiffs, however, are not obligated to expend more than a nominal sum to repair the damages. . . . [I]t's the law *that the plaintiffs . . . must take all reasonable means to mitigate the dam-*

---

[16] We note that those plaintiffs who purchased their units from Stone apparently did not begin to complain about leakage problems until after Stone had purchased the last of those units he later resold to other plaintiffs.

*ages. But that they are not required to expend more than a* nominal amount of money. Nominal in this case being more than *trifling amount of money to repair the damages"* (emphasis supplied). Mark IV now asserts that the judge's use of the word "trifling" requires us to reverse the judgment against it. We do not agree.

The general rule with respect to mitigation of damages is that a plaintiff may not recover for damages that were avoidable by the use of reasonable precautions on his part. *Fairfield* v. *Salem,* 213 Mass. 296, 297 (1913). The United States Supreme Court has phrased the rule, with respect to contract actions, as follows: "[W]here a party is entitled to the benefit of a contract, and can save himself from a loss arising from a breach of it at a trifling expense or with reasonable exertions, it is his duty to do it, and he can charge the delinquent with such damages only as with reasonable endeavors and expense he could not prevent." *Warren* v. *Stoddart,* 105 U.S. 224, 229 (1881).[17] "The word 'trifling' in this passage has reference to the situation of the parties. It means a sum which is trifling in comparison with the consequential damages which the plaintiff is seeking to recover in the particular case." *Bear Cat Mining Co.* v. *Grasselli Chem. Co.,* 247 F. 286, 288 (8th Cir. 1917).

While the judge perhaps should have explained the law regarding mitigation of damages more clearly, emphasizing the factor of reasonableness and laying less stress on the amount of money expended which a trier of fact might find to have constituted a reasonable effort at mitigation, we do not comprehend how his use of the term "trifling" could have misled the jury. It appears that all plaintiffs took some measures, ranging from coating all or parts of their roofs

---

[17] See *Matter of the Estate of Stannard,* 179 Kan. 394, 399 (1956) ("rule [is] that a person injured by breach of a contract is bound to exercise reasonable care to avoid loss or minimize the resulting damage where he can do so with reasonable exertion or at trifling expense"); *Haywood* v. *Massie,* 188 Va. 176, 183 (1948) (recovery of profits lost on unplanted crops disallowed because plaintiff, "with trifling inconvenience," could have bypassed defendant's nuisance and planted crops).

with various substances, to replacing those roofs, in response to their leakage problems. The first of these measures was the remedy most often tried, both by the plaintiffs and by Mark IV's workmen. It was Mark IV's normal remedy for such problems, and was relatively inexpensive. In so far as Mark IV argues that only those plaintiffs who replaced their roofs took reasonable measures to mitigate their damages, the record does not support this assertion.[18] In any event, we do not comprehend how, on the facts of this case, the instruction on damages could have prejudiced Mark IV. That instruction certainly does not require reversal of the judgment against Mark IV.

Mark IV also asserts that the judge erred in instructing the jury on the assessment and measure of damages, in that his instructions allegedly led the jury to believe that, if they found for the plaintiffs, the plaintiffs were entitled to recover the amount it would cost them to have their roofs replaced. The judge instructed the jury that the plaintiffs' recovery, if any, with respect to the problems with their roofs, should be "a sum of money that would place them back in the position that they were. In other words, [with] a good leak-proof roof." He further instructed them that because, as "we are all aware of the fact that inflation has swept the country, . . . the amount of damages [awarded should] be based upon [the amount necessary] to fix the roof, at a reasonable time after the damage has occurred." This was clearly not an instruction that the jury should find in an amount that would enable the plaintiffs to replace the roofs. Taken in its entirety, the charge left to the jury to decide what constituted a reasonable remedial measure and what the cost of that measure would be. This claim of error is therefore groundless.

Mark IV argues, finally, that the judge erred in instructing the jury, if they found for the plaintiffs, to deliver a verdict granting a single award of damages. This instruction was based on the judge's belief that the complaint was so

---

[18] Mark IV took the position at trial that the leakage problems could have been solved without replacement of the roofs.

structured as to preclude the jury from returning verdicts for each individual plaintiff. The defendant objected to the instruction, and requested that the judge instruct the jury to answer written interrogatories regarding the amount of damages awarded to each plaintiff. See Mass. R. Civ. P. 49 (b), 365 Mass. 812 (1974). That rule states that the judge *may* submit such interrogatories to the jury. The judge has wide discretion as to whether or not special questions should be submitted to the jury. *Viaux* v. *John T. Scully Found. Co.*, 247 Mass. 296, 301 (1924). In any event, Mark IV has not suggested how the denial of its request for jury interrogatories, or the instruction to return an undifferentiated verdict, could have resulted in prejudice to it. There was no error.

7. *Disposition.* The case is remanded to the Superior Court where the judge shall determine the amount of reasonable attorney's fees and costs which are to be awarded to the plaintiffs. The judge shall also determine whether Mark IV refused to grant relief upon demand to the plaintiffs in bad faith with knowledge or reason to know that the act or practice complained of violated G. L. c. 93A, § 2, and, if he determines that to have been the case, shall fix the amount of damages to be awarded to the plaintiffs. G. L. c. 93A, § 9 (3). The judgment in favor of the plaintiffs entered on October 27, 1980, is to be modified in accordance with these determinations. The judgment in favor of Stone on Mark IV's counterclaim, entered on October 24, 1980, is affirmed.

*So ordered.*