An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-1186

Filed: 1 September 2015

Halifax County, No. 08 CVS 1437

ASHLEY KEITH PITTMAN, and wife, DeANNA PITTMAN, Plaintiffs,

v.

HENRY MONCURE MOTORS, INC., MOBILE HOME SALES, a Corporation, and CRESTLINE HOMES, INC., a Corporation, Defendants.

Appeal by defendants from judgment entered 30 June 2014 by Judge W. Russell Duke, Jr. in Halifax County Superior Court. Heard in the Court of Appeals 18 March 2015.

*Jimmie R. "Sam" Barnes for plaintiffs-appellees.*

*Chichester Law Office, by Geoffrey P. Davis, for defendants-appellants Henry Moncure Motors, Inc. and Mobile Home Sales.*

GEER, Judge.

Defendants Henry Moncure Motors, Inc. ("Moncure Motors") and Mobile Home Sales appeal from a judgment entered against them for damages arising out of defects in a manufactured home that Moncure Motors sold to plaintiffs. On appeal, defendants primarily argue that the warranties set out in the Uniform Commercial Code ("UCC"), the basis for the trial court's award, do not apply to defendants' sale of the manufactured home to plaintiffs. We hold that the manufactured home that

defendants Moncure Motors sold to plaintiffs here was a "good" covered by the UCC. It is well established that the UCC allows a purchaser of goods to hold the seller liable for breach of the implied warranty of merchantability. Because the undisputed evidence and the trial court's findings establish that the home's defects breached the implied warranty of merchantability, we affirm the trial court's judgment and award of damages against defendants.

Facts

Plaintiffs' evidence tends to show the following facts. On 10 January 2003, after talking with Philip Moncure, President and General Manager of defendant Moncure Motors, plaintiffs Ashley Keith Pittman and DeAnna Pittman entered into a contract with Moncure Motors for the sale, delivery, and setup of a manufactured home for a total price of $92,135.00. That price included $15,000.00 in "optional equipment," $9,500.00 of which was for a brick foundation. Plaintiffs intended for the home to be their primary residence.

At Mr. Moncure's request, Mr. Pittman contacted Jessie Thompson to build a foundation for the home. Mr. Moncure contacted a crane crew in Petersburg, Virginia and a contractor named Tommy Marlowe to perform the rest of the setup of the home. Mr. Marlowe and his crew were tasked with "lift[ing] the walls and the roof and put[ting] all that stuff together," including "put[ting] braces on the rafters," nailing extra shingles, and attaching plywood to the roof.

The home, which was manufactured by Crestline Homes, Inc. ("Crestline"), a company that has apparently filed for bankruptcy, was delivered to plaintiffs' lot in two sections wrapped in a plastic wrap seal sometime in May 2003. In transit, wind and rain ripped the plastic of one of the sections all the way down its side, causing water to enter into it. After both sections were delivered to plaintiffs' lot, more rain fell and entered into the exposed section. Prior to the setup, Mr. Pittman and Mr. Moncure together saw that one of the sections had suffered water damage from the leakage.

After the foundation was built by Mr. Thompson and the home was lifted onto the foundation by crane, Mr. Marlowe's crew erected the roof. However, they improperly installed the roof.

Although Mr. Pittman told Mr. Moncure that "this is not what I paid for" and to "take [the home] back," Mr. Moncure assured Mr. Pittman that he would address the problems with the home. Part of the home was gutted, cleaned of mold, and rebuilt, and, in September 2003, plaintiffs moved into the home. After moving in, plaintiffs experienced severe water leakage through their roof as well as a number of other problems with the interior and exterior of the home. Mr. Moncure unsuccessfully attempted to address these problems over the next year and, in September 2004, plaintiffs, through their attorney, demanded a replacement home from Moncure Motors and Crestline.

Following the September 2004 letter, the parties agreed that Crestline would be given a further opportunity to cure the defects in the home, and Moncure Motors would be financially responsible for the repairs covered by warranty. While over the next two years, the roof, vinyl siding, and electrical circuit breakers were replaced, many defects, including problems with the electrical system, persisted.

Plaintiffs filed suit against Crestline and Moncure Motors at some point in 2006, but dismissed that action without prejudice. On 26 September 2008, plaintiffs refiled their complaint against defendants and Crestline alleging that as a result of Crestline's manufacture and delivery and defendants' setup of the home, the home sustained extensive water damage and other serious problems with the roof, vinyl siding, flooring, bathroom, interior walls, and electrical wiring.

On 9 December 2008, Moncure Motors filed an answer to plaintiffs' complaint. On 12 December 2008, Crestline answered plaintiffs' complaint denying the material allegations, and on 29 December 2008, Crestline filed a cross-claim against Moncure Motors asserting a claim for indemnification for work performed on plaintiffs' home allegedly on Moncure Motors' behalf. On 7 January 2009, Moncure Motors amended its answer to respond to Crestline's cross-claim and, in turn, filed a cross-claim against Crestline for indemnification or contribution for any liability Moncure Motors might have on account of, among other reasons, any alleged breach of warranty of Crestline.

On 14 April 2014, following a pre-trial conference in which the parties entered into several stipulations, the trial court held a bench trial. Plaintiffs presented the testimony of Mr. Pittman, and defendants presented the testimony of Mr. Moncure. The trial court found both witnesses "to be very credible" and noted that "the evidence and/or testimony in these matters was basically the same[.]"

On 30 June 2014, the trial court entered a judgment in plaintiffs' favor that included the following findings of fact. Defendant Moncure Motors is a dealer in the business of selling new manufactured modular homes. Plaintiffs and Moncure Motors entered into a contract providing that plaintiffs would purchase from Moncure Motors "a new modular home, a dwelling," and Moncure Motors would place and setup the home on plaintiffs' lot. Plaintiffs further agreed to pay Moncure Motors a total negotiated price of $92,135.00. The house sustained extensive water damage prior to the setup, which caused substantial defects to the manufactured dwelling. The subsequent setup was also not performed in a workmanlike manner, resulting in further substantial defects in the manufactured dwelling.

The combination of the water damage sustained prior to the setup and the failure to set up the house in a workmanlike manner "caused the dwelling to fail to meet the standard workmanlike quality then prevailing at the time and place of construction in Halifax County, resulting in substantial defects in the manufactured dwelling[.]" Plaintiffs' expectations regarding the purchase of the dwelling were not

met, and "a reasonable person in the same or similar circumstances would consider the breach a substantial deprivation of the material benefit of the purchase of the dwelling[.]" The trial court further found that by their words and conduct, plaintiffs elected to rescind the purchase of the dwelling. Plaintiffs gave Moncure Motors notice of the breach and, subsequently, Moncure Motors attempted to correct or repair "the water damage and the workmanlike setup of the dwelling in a reasonable and timely manner, but failed to be successful in doing so."

Based on these findings, the trial court made the following conclusions of law:

> 1. That a newly manufactured/modular home is defined in Article 9 of Chapter 143 and Chapter 87 of the North Carolina General Statutes.
>
> 2. That the Uniform Commercial Code, Chapter 25 of the North Carolina General Statutes sets forth the applicable warranty provisions for such manufactured/modular homes; and
>
> 3. That the Defendant, Henry Moncure Motors, Inc. was in the business of selling manufactured/modular homes on the date in question and did sell unto the Plaintiffs a newly manufactured/modular home for the sum of $92,135.00; and
>
> 4. That pursuant to the aforesaid sale the Defendant, Henry Moncure Motors, Inc. did express and/or imply to the Plaintiffs that the manufactured/modular home was constructed free from major structural defects and in a workmanlike manner so that it met the standard of workmanlike quality then prevailing at the time and place of construction and that it was fit for the particular purpose for which it was purchased; and

5.      That the Defendant, Henry Moncure Motors, Inc. did breach the expressed/implied warranty to the Plaintiff; and

6.      That the Plaintiffs justifiably rescinded the sale/purchase of the manufactured/modular home; and

7.      That the Plaintiffs are entitled to recover money damages from the Defendant, Henry Moncure Motors, Inc. for the breach of the expressed/implied warranty.

The trial court then awarded to plaintiffs for breach of warranty $92,135.00, plus interest at the legal rate from 1 September 2004, the date that the trial court found plaintiffs "made it unequivocally clear that they had rescinded the contract[.]" The trial court further specified that upon Moncure Motors' payment of the damages, Moncure Motors would be entitled to recover the manufactured home from plaintiffs' property upon no less than six months' notice, although Moncure Motors was required "to make this election" within 18 months from the entry of judgment. Defendants timely appealed to this Court.

Standard of Review and Applicable Law

With respect to our review of defendants' challenges to the trial court's judgment, " '[i]t is well settled in this jurisdiction that when the trial court sits without a jury, the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts. Findings of fact by the trial court in a non-jury

trial have the force and effect of a jury verdict and are conclusive on appeal if there is evidence to support those findings.' " *Majewski Enters., Inc. v. Park at Langston, Inc.*, 211 N.C. App. 525, 530-31, 711 S.E.2d 454, 459 (2011) (quoting *Shear v. Stevens Bldg. Co.*, 107 N.C. App. 154, 160, 418 S.E.2d 841, 845 (1992)). In making its findings, "[t]he trial court is entitled to draw all reasonable inferences from the evidence." *Estroff v. Chatterjee*, 190 N.C. App. 61, 72, 660 S.E.2d 73, 80 (2008). Any findings not challenged on appeal "are presumed to be supported by competent evidence and are binding on appeal." *Montague v. Montague*, ___ N.C. App. ___, ___, 767 S.E.2d 71, 74 (2014). " 'A trial court's conclusions of law, however, are reviewable *de novo*.' " *Majewski Enters.*, 211 N.C. App. at 531, 711 S.E.2d at 459 (quoting *Shear*, 107 N.C. App. at 160, 418 S.E.2d at 845).

At the outset, we note that there is no dispute that plaintiffs' home is subject to the provisions of Article 9A of Chapter 143 of the General Statutes, as it comes squarely within the definition of "[m]anufactured home" found in that chapter: "A structure, *transportable in one or more sections*, which, in the traveling mode, is eight feet or more in width or is 40 feet or more in length, or when erected on site, is 320 or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air conditioning and electrical systems contained therein." N.C. Gen. Stat. § 143-143.9(6) (2013) (emphasis added).

As the home was a manufactured home under Article 9A, it also falls within the scope of the UCC. The provisions of North Carolina's version of the UCC, in Article 2 of Chapter 25 of the General Statutes, apply to contracts for the sale of "goods," N.C. Gen. Stat. § 25-2-102 (2013), which include "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale[,]" N.C. Gen. Stat. § 25-2-105(1) (2013). Because plaintiffs' home is a "[m]anufactured home" under Article 9A of the General Statutes, the home is also a "good" described under the UCC. *Cf. Singletary v. P & A Invs., Inc.*, 212 N.C. App. 469, 474, 712 S.E.2d 681, 685 (2011) (explaining manufactured homes are generally treated as "goods" under UCC except when "annexed to land with the intent that it be permanent" or other circumstances present at point of sale justifying treating mobile home "as realty affixed to the land").

<u>Challenges to Findings of Fact</u>

Defendants first challenge the trial court's Finding of Fact No. 2, which provides that plaintiffs and Moncure Motors entered into a contract "that the Plaintiffs would purchase from the Defendant, Henry Moncure Motors, Inc. a new modular home, a dwelling to be placed and setup [sic] on the Plaintiff's property by the Defendant, Henry Moncure Motors, Inc." However, the parties' stipulations included that plaintiffs entered into a contract with Moncure Motors for Moncure Motors to sell them the home at issue. That contract stated that Moncure Motors

"give[s] free delivery . . . for a distance as far as 50 miles from our lot." At trial, Mr. Moncure testified that he arranged for the delivery of plaintiffs' home directly from Crestline to plaintiffs' lot because that arrangement was more convenient for Moncure Motors. This evidence supports the finding that the contract was for Moncure Motors to place the modular home on plaintiffs' lot. *See also* N.C. Gen. Stat. § 25-2-509(1)(b) (2013) (providing that seller contractually retains risk of loss until delivery at the designated location if contract provides goods are to be transported by carrier and delivered at particular location).

Additionally, Moncure Motors took out a "NORTH CAROLINA MODULAR BUILDING SET-UP CONTRACTOR LICENSE BOND," as is required for a "set-up contractor" under N.C. Gen. Stat. § 143-143.12 (2013), and Mr. Moncure testified that the set-up contractor is "responsible for lifting the home off the frame and putting it on the foundation and raising the roof and completely drying it in." The evidence also showed that Moncure Motors procured, or required plaintiffs to contact, particular subcontractors to set up plaintiffs' manufactured home, and that Mr. Moncure was responsible for paying these contractors from the money plaintiffs paid to Moncure Motors. This evidence supports the finding that plaintiffs contracted with Moncure Motors to set up the home on plaintiffs' lot. Finding of Fact No. 2 is, therefore, supported by the evidence and is binding on appeal.

Defendants also challenge Finding of Fact No. 4, which provides that "before [it] was setup [sic] by the Defendant, Henry Moncure Motors, Inc.," plaintiffs' home sustained "extensive water damage, which caused substantial defects to the manufactured dwelling[.]" Article 9A of Chapter 143 defines "[s]etup" as "[t]he operations performed at the occupancy site which render a manufactured home fit for habitation." N.C. Gen. Stat. § 143-143.9(12). We have already concluded that the record contains evidence supporting the finding that Moncure Motors was responsible for the setup of plaintiffs' manufactured home, and we also conclude that the record evidence supports the finding that the home sustained extensive damage in the course of delivery to plaintiffs and prior to setup.

Article 9A also defines "[s]ubstantial defect" as "[a]ny substantial deficiency in or damage to materials or workmanship occurring in a manufactured home which has been reasonably maintained and cared for in normal use[,]" and it also means "any structural element, utility system or component part of the manufactured home which fails to comply with the [Building] Code." N.C. Gen. Stat. § 143-143.9(14). At trial, Mr. Moncure acknowledged that the home suffered "extensive" water damage prior to setup. After being delivered, the sections sat on plaintiffs' lot for several weeks waiting for Mr. Thompson to complete the foundation. The evidence showed that, during this time, water was able to pool up on the inside and on the unraised roof of the exposed section. When the plastic was removed from that section, the

interior "looked like a rainbow" due to considerable mold growth. Additionally, the vinyl siding looked like "[a] roller coaster." This evidence supports a reasonable inference by the trial court that the water damage prior to the setup caused "substantial deficiency in or damage to materials or workmanship." *Id.* Finding of Fact No. 4 is, therefore, supported by evidence presented at trial.

Defendants also challenge Finding of Fact Nos. 5 and 6, which state that the setup was not performed in a workmanlike manner, led to water damage to the dwelling, and "caused substantial defects in the manufactured dwelling[.]" Finding of Fact No. 6 also provides that water damage to the home "caused the dwelling to fail to meet the standard of workmanlike quality" and resulted in "substantial defects in the manufactured dwelling[.]"

The evidence at trial indicated that after the home was finally placed on its foundation, Mr. Pittman observed Mr. Marlowe's work crew as it performed the setup. Mr. Pittman testified: "I have never seen people work that fast in my life doing sloppy work[,]" and he noticed that "they were in one hundred hurries." When the setup crew was finished, "[y]ou could pick the roof up off the two-by-sixes." After plaintiffs and their children moved in, they noticed that the roof leaked extensively, water "poured into the house," water was absorbed into the walls, water came out of the wall sockets, nails began backing out of the flooring, the children's bathtub cracked, the floors sank, the home wobbled when people walked through it, the walls and

ceilings cracked, the countertops warped, doors would not shut, and the electrical box made a "sizzling" sound and burning smell that was attributed to short-circuiting.

This evidence supports the finding that the setup was not performed "in a good and workmanlike manner." *See Domingue v. Nehemiah II, Inc.*, 208 N.C. App. 429, 431, 435, 703 S.E.2d 462, 463-64, 466 (2010) (reversing dismissal for failure to state negligent construction claim alleging breach of workmanlike quality standard for defects including damaged roof, improperly installed flashings causing water to intrude into building, failure to waterproof doorjambs and install doors causing water intrusion, fungal growth, subfloor damage, defective floor joists resulting in sagging floors, and cracked walls and tiles). This evidence also supports a finding that the improper setup caused substantial defects to the home. *See Osburn v. Bendix Home Sys., Inc.*, 613 P.2d 445, 447, 449 n.9 (Okla. 1980) (upholding trial court's determination of breach of warranty that mobile home would be " 'free from any substantial defects in material or workmanship' " in light of evidence that "substantial water leakage made itself manifest during a rainstorm" causing "heavy water damage" to interior).

Defendants also challenge Findings of Fact Nos. 7 and 10. Finding of Fact No. 7 provides that plaintiffs "elected to rescind" the purchase of the home. Finding of Fact No. 10 provides in pertinent part that plaintiffs "gave and the Defendant, Henry Moncure Motors, Inc. had notice of the breach and thereafterwards the Defendant,

Henry Moncure Motors, Inc. attempted to repair or correct the water damage and the workmanlike [sic] setup of the dwelling in a reasonable and timely manner, but failed to be successful in doing so."

The determinations whether plaintiffs rescinded their contract and whether Moncure Motors breached the contract depend on what warranties and remedies protected plaintiffs. Because defendants dispute plaintiffs' rights and remedies, these determinations are more appropriately discussed below along with the conclusions of law. To the extent that Finding of Fact No. 10 specifies that Moncure Motors had notice of the defects and attempted to repair them, but failed to adequately do so, ample evidence supports that portion of the finding.

Mr. Moncure admitted at trial that he had extensive conversations with Mr. Pittman about the problems with plaintiffs' home. Further, Mr. Pittman testified that despite allowing Moncure Motors and Crestline about three years after plaintiffs moved into the home in order to repair the defects,

> you sleep at night wondering whether or not you are going to get burned up [because of the faulty electrical system]. My children -- one child sleeps in the floor at the foot of the bed, and one child sleeps on the couch, because they are scared to get away from us. The bathroom still has the mold in there. I can't get it out of it. . . . My floors are sagging. My walls are cracking. My windows [are] messed up. My roof is unlevel. Upstairs will cost me double or triple to fix it.

With respect to the mold in the bathroom, Mr. Pittman explained that whenever he runs the bathtub in the children's bathroom, black mold starts to appear at the top of the door, and that while he has tried to paint over it and increase the ventilation in the bathroom, the mold problem persists. The portion of Finding of Fact No. 10 that Moncure Motors had notice of the home's problems, but failed to repair them, is supported by evidence.

<u>The Trial Court's Conclusions of Law</u>

Defendants first contend that plaintiffs' manufactured home is not, as the trial court concluded, defined in "Article 9 of Chapter 143 and Chapter 87 of the North Carolina General Statutes." The conclusion that plaintiffs' home is described by Article 9 of Chapter 143 of the General Statutes appears to be a scrivener's error, as no provision in Article 9 provides any definitions of dwellings, no reference was made to Article 9 at the hearing, and, moreover, plaintiffs' home squarely falls within the definition of "manufactured home" in Article 9A of Chapter 143. The trial court's reference to Chapter 87, which governs the Homeowners Recovery Fund which is not at issue here, is immaterial.

Defendants next challenge the trial court's conclusion that the UCC "sets forth the applicable warranty provisions for such manufactured/modular homes[.]" The UCC provides for the creation of express warranties, N.C. Gen. Stat. § 25-2-313 (2013), an implied warranty of merchantability, N.C. Gen. Stat. § 25-2-314 (2013),

and an implied warranty of fitness for a particular purpose, N.C. Gen. Stat. § 25-2-315 (2013). Defendants contend that the UCC warranties do not apply since Article 9A provides for warranties relating to the manufacture, sale, delivery, and setup of a manufactured home.

Defendants essentially argue that Article 9A provides the exclusive rights and remedies for a purchaser of a manufactured home. While N.C. Gen. Stat. § 143-143.16 (2013) does provide various warranties for purchasers of manufactured homes that apply to dealers, set-up contractors, manufacturers, and suppliers (terms defined in N.C. Gen. Stat. § 143-143.9), N.C. Gen. Stat. § 143-143.23 (2013) -- entitled "Other remedies not excluded" -- also provides that "[*n*]*othing in this Part . . . shall limit any right or remedy available to the buyer* or any power or duty of the Attorney General." (Emphasis added.) Thus, under the plain language of the statute, Article 9A does not preclude plaintiffs' remedies under the UCC. Because manufactured homes, like mobile homes, can be "goods" under the UCC, the legislature intended, under N.C. Gen. Stat. § 143-143.23, to make the UCC's rights and remedies available to purchasers of manufactured homes.

In further arguing that Article 9A of Chapter 143 excludes buyers of manufactured homes from the rights and remedies available under the UCC, defendants point to N.C. Gen. Stat. § 143-143.17(a) (2013), which provides that "claim[s] for warranty service or about a substantial defect . . . made to a licensee . . .

shall be handled as provided in this Part" by submitting such claims to the North Carolina Manufactured Housing Board for resolution. While this provision provides an extra-judicial mechanism for handling warranty or defect claims, nothing within it limits the rights of buyers of manufactured homes to those rights set out in Article 9A. We conclude that Article 9A does not limit the warranties available to a buyer of a manufactured home to those specifically set forth in that Article.

Defendants next contend that because, as the trial court found, the contract at issue was for the manufacture, sale, delivery, and setup of the manufactured home, the contract encompassed both goods and services, and therefore Article 2 of the UCC does not apply. While Article 2 of the UCC "does not apply to contracts for the provision of services[,]" this Court has adopted the "predominant factor" test to determine whether a mixed contract, which includes the provision of both goods and services, like the one at issue here, should be considered a contract for goods. *Hensley v. Ray's Motor Co. of Forest City, Inc.*, 158 N.C. App. 261, 265, 580 S.E.2d 721, 724 (2003). "Factors which have been used in determining whether a mixed contract should be governed by the UCC include the following: '(1) the language of the contract, (2) the nature of the business of the supplier, and (3) the intrinsic worth of the materials.' " *Id.* at 266, 580 S.E.2d at 724-25 (quoting *Princess Cruises, Inc. v. Gen. Elec. Co.*, 143 F.3d 828, 833 (4th Cir. 1998)).

Here, the language of the contract deals primarily with the terms of sale, including the listed base price of the home as $76,500.00 and itemized "optional equipment" in the amount of $15,000.00. The "optional equipment" included a heating oil rack, termite protection, electric system installation, plumbing, and a brick foundation. The record indicates that Moncure Motors is in the business of selling, distributing, and setting up mobile and manufactured homes, but that, predominantly, Moncure Motors' business is the sale and distribution of mobile homes. Further, only a relatively small portion of the contract was itemized as not goods -- i.e., termite protection, electric system installation, plumbing, and brick foundation.

Given the terms of the contract, it is apparent that the sale of the manufactured home predominated and, consequently, Article 2 of the UCC is applicable. *See id.* at 266, 580 S.E.2d at 725 ("[W]e note the language of the contract deals primarily with the terms of sale, including the price, warranties, description and model of the mobile home, and options and accessories. The nature of [defendant's] business is the sale and distribution of mobile homes. Finally, the intrinsic worth of the mobile home is approximately its fair market value or the purchase price. Accordingly, we hold the contract is predominantly a contract for the sale of goods[.]").

Defendants, however, liken Moncure Motors' role to that of the defendant in *Jones v. Clark*, 36 N.C. App. 327, 329, 244 S.E.2d 183, 184 (1978), who, as an inspector of modular homes for a manufacturer, improperly certified that the modular home as manufactured in that case was fit for habitation. In *Jones*, this Court held that the defendant-inspector was not liable for the manufacturer's breach of warranty under the UCC because the inspector only provided services for the plaintiff-buyer, and there was no privity of contract between the inspector and the buyer. *Id.* at 330, 244 S.E.2d at 185. The UCC, however, provides direct liability against a seller of goods for a breach of warranty in the sale of goods. *See* N.C. Gen. Stat. § 25-2-711(1) (2013); *Wright v. T & B Auto Sales, Inc.*, 72 N.C. App. 449, 454, 325 S.E.2d 493, 496 (1985) (holding purchaser of car entitled to sue dealer for breach of implied warranty of merchantability). Even though Moncure Motors contracted for the provision of services, those services were provided pursuant to a contract for the sale of a manufactured home by Moncure Motors to plaintiffs. Therefore, *Jones* is inapposite.

Defendants next challenge the conclusion that Moncure Motors "did express and/or imply to the Plaintiffs that the manufactured/modular home was constructed free from major structural defects and in a workmanlike manner so that it met the standard of workmanlike quality then prevailing at the time and place of construction and that it was fit for the particular purpose for which it was purchased[.]" We agree

that there are no findings to support the conclusion that Moncure Motors expressly warranted plaintiffs' home.

With respect to the UCC's implied warranty of merchantability, defendants assume that because "[i]n its conclusions of law, the trial court does not reference the implied warranty of merchantability," the trial court must have concluded that Moncure Motors did not breach any implied warranty of merchantability. Defendants point out that the language the trial court uses to describe the warranty that Moncure Motors "did express and/or imply" to plaintiffs is not specifically found in the UCC but is strikingly similar to the language the Supreme Court used in articulating the implied warranty in *Hartley v. Ballou*, 286 N.C. 51, 62, 209 S.E.2d 776, 783 (1974). The trial court's order, however, makes clear that it is applying the warranties found in the UCC: "[T]he Uniform Commercial Code, Chapter 25 of the North Carolina General Statutes sets forth the applicable warranty provisions for such manufactured/modular homes[.]"

The UCC's warranty of implied merchantability guarantees, among other things, that goods "are fit for the ordinary purposes for which such goods are used[.]" N.C. Gen. Stat. § 25-2-314(2)(c). Implicit to a home's fitness for use as a dwelling is that it be free of major defects. *See Vintage Homes, Inc. v. Coldiron*, 585 S.W.2d 886, 888 (Tex. App. 1979) (considering evidence of "fifteen separate defects . . . [which] were certainly of a serious nature" in support of breach of warranty for mobile home's

fitness of use as dwelling). The findings and conclusions set out in the trial court's order support the conclusion that Moncure Motors implied a warranty of merchantability to plaintiffs that their home was fit for its ordinary use as a dwelling.

Defendants next challenge the conclusion that Moncure Motors "did breach the expressed/implied warranty made to the Plaintiff[s]." The evidence presented at trial overwhelmingly supports a conclusion that the home was not fit for use as a dwelling unit. Nevertheless, the question before this Court is whether the trial court's findings of fact support the conclusion that the implied warranty of merchantability was breached. We hold that the trial court's findings minimally support the conclusion that Moncure Motors breached the implied warranty of merchantability because the home was not fit for use as a dwelling. *See id.* at 887-88 (holding jury verdict of breach of warranty of fitness for ordinary use of mobile home as dwelling supported by evidence of more than one dozen electrical, plumbing, and aesthetic defects, as well as a buckled roof, most of which "permit[ed] the elements to enter into the trailer").

We next address the trial court's determination that plaintiffs "elected to rescind" the purchase of the manufactured home by their "words and conduct." Although "rescission" is not a remedy available under the UCC, N.C. Gen. Stat. § 25-2-608 (2013) provides for the similar remedy of revocation of acceptance. After accepting goods from a seller,

(1)    The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

(a)    on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b)    without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

*Id.* "A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them." N.C. Gen. Stat. § 25-2-608(3). "Formal notice that acceptance is being revoked is not necessary; any conduct by the buyer manifesting to the seller that he is seriously dissatisfied with the goods and expects redress or satisfaction is sufficient." *Warren v. Guttanit, Inc.*, 69 N.C. App. 103, 109, 317 S.E.2d 5, 10 (1984).

Although the trial court referred to the remedy of "rescission," in UCC cases, our appellate courts have concluded that references to the remedy of rescission should be treated as revocations of acceptance. *See Riley v. Ken Wilson Ford, Inc.*, 109 N.C. App. 163, 173, 426 S.E.2d 717, 724 (1993) ("Rescission of a contract is not addressed in the [UCC], but it has been treated as revocation of acceptance in the context of a sale of goods."). Accordingly, we must determine whether the trial court's findings are sufficient to support the conclusion that plaintiffs revoked their acceptance.

After making findings regarding the substantial defects in the manufactured home, the trial court determined that plaintiffs by "words and conduct . . . elected to rescind the purchase of the dwelling[.]" The court found that "a reasonable person in the same or similar circumstances would consider the breach a substantial deprivation of the material benefit of the purchase of the dwelling[.]" After plaintiffs gave Moncure Motors notice of the breach, Moncure Motors "attempted to repair or correct the water damage and the workmanlike [sic] setup of the dwelling in a reasonable and timely manner, but failed to be successful in doing so." Based on these findings, the trial court concluded that plaintiffs "justifiably rescinded the sale/purchase of the manufactured/modular home[.]" We hold that the record contains ample evidence to support the findings regarding the defects, notice of those defects to Moncure Motors, plaintiffs' attempts to reject acceptance of the manufactured home by demanding replacement of the home, and Moncure Motors' inability to repair and correct the defects. The evidence is sufficient to support a determination that plaintiffs initially revoked acceptance of the purchase of their home. *See Davis v. Colonial Mobile Homes*, 28 N.C. App. 13, 17-18, 220 S.E.2d 802, 804-05 (1975) (holding letter demanding replacement or refund of purchase price of mobile home, along with buyer's numerous complaints of defects to dealer of mobile home, gave notice of revocation of acceptance to dealer).

Nonetheless, defendants contend that plaintiffs' uninterrupted residence in the home, for at least 11 years, should ultimately be read as plaintiffs' acceptance of the home and its nonconformities. While, under the UCC, any exercise of ownership after giving notice of revocation of acceptance generally constitutes acceptance, *see* N.C. Gen. Stat. § 25-2-606(1)(c) (2013), the "answer to the question of whether [continued] use [of defective goods] equals acceptance [after giving notice of revocation of acceptance] under the UCC. . . depends upon whether the use was reasonable." *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 772 (Tex. App. 2005) (internal quotation marks omitted).

The reasonableness of continued use of defective goods after revocation may depend on whether "(1) the seller tendered instructions concerning return of the rejected goods upon notice of the revocation; (2) business needs or personal circumstances compelled the buyer's continued use; (3) the seller continued to offer assurances that the nonconformities would be cured or that the buyer would be recompensed for dissatisfaction and inconvenience during the period of continued use; (4) the seller acted in good faith; and (5) the seller suffered undue prejudice as a result of the continued use." *Wilk Paving, Inc. v. Southworth-Milton, Inc.*, 162 Vt. 552, 557, 649 A.2d 778, 782 (1994). While "[w]hat constitutes reasonable use is a question of fact to be decided under the circumstances of each case, . . . courts generally hold that using goods during the time when the seller is promising or trying

unsuccessfully to cure the nonconformity will not adversely affect the buyer's rights." *Toshiba Mach. Co.*, 180 S.W.3d at 772-73.

Here, pursuant to Crestline's promise to make further repairs following the September 2004 letter, numerous attempts were made to address continued defects in the home, including, among other things, replacing the roof, vinyl siding, and electrical circuit breakers. Yet, despite these attempted repairs, the record and transcript are replete with references to problems that had not been repaired at the time of trial. Further, Mr. Pittman testified that he has been continuously dissatisfied with the home: "[I]t is steady stuff wrong. It has never been right. . . . And I feel like when I paid that money -- I can understand a few things being wrong, but I think it went overboard." Mr. Pittman testified that he would have returned the home to Moncure Motors, but Moncure Motors would not allow that. He also testified that he and his family would have walked away from the home if they were not indebted on it and the home were not on their family's land. Nothing in the record suggests that plaintiffs ever indicated to defendants that they were ever even remotely satisfied with the home.

Contrary to defendants' contention that plaintiffs ultimately accepted the egregiously defective home, the evidence shows that if plaintiffs at all waived revocation of acceptance after giving notice via the September 2004 letter, such a waiver was made on the condition that the repairs would be made to plaintiffs'

satisfaction. The evidence was uncontradicted that plaintiffs would have walked away from the home but for the facts that Moncure Motors refused tender of their home; the home was placed on plaintiffs' family land; plaintiffs were indebted on it; after giving notice of revocation of acceptance, plaintiffs agreed to allow Moncure Motors and Crestline more time to attempt repairs; and the subsequent numerous attempts to address the defects in the home were unsuccessful. Based on that evidence, the conditions necessary for plaintiffs to waive their revocation of acceptance failed to materialize. We also note that there is no evidence that defendants were prejudiced by the continued use: Mr. Moncure testified that it cost less to attempt repairs than to replace the home, and Moncure Motors acquiesced in Crestline's decision to attempt further repairs.

Additionally, plaintiffs' continued residence in the home since the filing of the initial lawsuit in 2006 should not, as a matter of law, be counted against them in determining whether they accepted the defective home. *See Mobile Home Sales Mgmt., Inc. v. Brown*, 115 Ariz. 11, 16-17, 562 P.2d 1378, 1383-84 (Az. App. 1977) ("[T]he staying in the mobile home pending the law suit cannot be, as a matter of law in this case, considered a waiver of the buyers' right to revoke the prior acceptance of the home."). Consequently, plaintiffs' continued residence in the home was reasonable. We hold that the trial court did not err in determining that plaintiffs revoked their acceptance of the home. *See Schumaker v. Ivers*, 90 S.D. 75, 85, 238

N.W.2d 284, 289 (1976) ("[W]e conclude that the trial court did not err in holding that plaintiffs had . . . revoked their acceptance. . . . If [the] revocation of acceptance [of a first organ] was in any way waived by plaintiffs' accepting delivery of [a] second organ, such [acceptance] was clearly based upon the condition that the replacement organ would operate satisfactorily, a condition that failed to materialize.").

Defendants attempt to distinguish this case from *Performance Motors, Inc. v. Allen*, 280 N.C. 385, 397, 186 S.E.2d 161, 168 (1972), in which our Supreme Court explained, based on the evidence in that case, "[c]onstant complaints from September to December with cessation of payment would seem to constitute sufficient notice of revocation of acceptance." Defendants suggest that the evidence in this case is insufficient to support revocation of acceptance because, unlike in *Performance Motors*, plaintiffs here continued making payments on the home. However, nothing in *Performance Motors* indicates that there can be no revocation of acceptance simply when a buyer continues to possess and make payments on a defective good regardless of other circumstances.

Given the circumstances of this case, including the fact that the home was plaintiffs' primary residence on which they were indebted, defendants' distinction between this case and *Performance Motors* based on the fact that, here, plaintiffs continued to make payments on the home, is untenable. *See Breaux v. Winnebago Indus., Inc.*, 282 So.2d 763, 769 (La. Ct. App. 1973) (holding continued mortgage

payments on motor home did not waive right to rescind sale where dealer refused tender, plaintiff had mortgage on motor home, and plaintiff was "left no recourse but to forego his action or try to purchase a second vehicle while paying for the first," which "the average buyer is unable to afford").

Defendants do not directly challenge the conclusion that the revocation of acceptance was justifiable as is required to revoke acceptance under N.C. Gen. Stat. § 25-2-608, but "assum[e], *arguendo*" that the defects substantially impaired the value of the home. Determining whether a good has a nonconformity which substantially impairs its value to the buyer "requires the application of a two-part test which considers both the buyer's subjective reaction to the alleged defect . . . and the objective reasonableness of this reaction . . . ." *Allen v. Rouse Toyota Jeep, Inc.*, 100 N.C. App. 737, 740, 398 S.E.2d 64, 65 (1990); *see* N.C. Gen. Stat. § 25-2-608(1). "Such defects as were actually cured . . . cannot be utilized in the determination of whether value was substantially impaired by the defects." *Jensen v. Seigel Mobile Homes Grp.*, 105 Idaho 189, 194, 668 P.2d 65, 70 (1983). We hold that the trial court's findings addressing the significant defects of the home, findings regarding both plaintiffs' subjective reaction to the defects and how a reasonable person would react to the defects, and findings that defendants were unable to repair the significant defects are sufficient to support a determination that the value of the home was substantially impaired by the defects. Consequently, the trial court's findings

support the conclusion that plaintiffs' revocation of acceptance was justifiable. *See Henery v. Robinson*, 67 Wash. App. 277, 288, 834 P.2d 1091, 1097 (1992) (holding uncured defects of sagging floor and gap in front door substantially impaired value of mobile home), *abrogated on other grounds by Klem v. Wash. Mut. Bank*, 176 Wash. 2d 771, 295 P.3d 1179 (2013) (en banc).

Although defendants further contend that "it is relevant that . . . Plaintiffs never alleged rescission in their Complaint" they cite no authority in support of this proposition. We, therefore, do not address this argument. *See* N.C.R. App. P. 28(a).

Defendants finally challenge the amount of damages awarded, contending that "[i]nstead of returning the full purchase price to Plaintiffs, the trial court should have based the amount of damages on some metric calculated to reasonably compensate the Plaintiffs for the consequences they suffered as a result of the Appellants' breach, while taking into account their continued use of the residence." While defendants cite *Hartley* for this proposition, *Hartley* does not apply the remedies available under the UCC, which are applicable here. N.C. Gen. Stat. § 25-2-711(1) provides that if a buyer "rightfully rejects or justifiably revokes acceptance then . . . the buyer may . . . recover[] so much of the price as has been paid[.]" Because the amount of damages reflect the total price paid as provided in the findings, we hold that this conclusion is supported by the findings.

AFFIRMED.

Judges ELMORE and INMAN concur.

Report per Rule 30(e).